IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) UNITED STATES OF AMERICA and the **STATE OF OKLAHOMA**, <br><br> Plaintiffs, *ex. Rel.* <br><br> 2) SCOTT FOSTER, <br><br> Plaintiff-Relator, <br><br> v. <br><br> 1) CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS | Case No.: 4:21-cv-00166-TCK-MTS <br> **JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. SECTION 3729 et seq**

Plaintiff-Relator Scott Foster, on behalf of the United States of America and the State of Oklahoma, for his Complaint against Defendant Cellco Partnership D/B/A Verizon Wireless ("Verizon") alleges, based upon personal knowledge and relevant documents, as follows:

**I.   INTRODUCTION**

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made, used, or presented and/or caused to be made, used, or presented by Defendant Verizon and/or its agents, employees, and co-conspirators in violation of the False Claims Act, 31 U.S.C. section 3729, *et seq.*, as amended ("the FCA").

2. "The FCA 'covers all fraudulent attempts to cause the government to pay out sums of money.'" *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc*., 543 F.3d 1211, 1217 (10th Cir. 2008) (quoting *United States ex rel. Boothe v. Sun Healthcare Group, Inc*., 496 F.3d 1169, 1172 (10th Cir.2007) (quotation omitted). "Under the *qui tam* provision of the statute, any individual

can sue on behalf of the United States government to recover for the government's payment of fraudulent claims." *Id.* (citing 31 U.S.C. § 3730(b)).

3. As explained in further detail below, this case concerns Verizon's sale of 50,000 Verizon Ellipsis Jetpack 900L hotspots to the state of Oklahoma for the purpose of permitting remote learning for thousands of Oklahoma students at the height of the COVID-19 pandemic.

4. Unfortunately, those hotspots were utterly defective: (a) prone to intense over heating resulting in the batteries swelling, failure of the devices, and the risk of injury or fire; and (b) Verizon's highly touted Mobile Device Management Suite ("MDM"), which was the mechanism by which all such connectivity was initiated by Verizon and was ostensibly designed to permit school district's to remotely manage the devices, routinely failed to function.

5. Far from smoothly assisting in the education of Oklahoma schoolchildren during a generational pandemic, Verizon's Ellipsis Jetpack 900L hotspots were little more than a hotbed of problems, problems Verizon was aware of (or recklessly ignored) prior to providing the devices and receiving federal funds in exchange.

6. Verizon targeted the US government, states, schools, students, and families across the country, to rid themselves of an existing, known to be problematic, inventory of thousands of hotspots all to reap the rewards of millions of dollars in Federal COVID stimulus funds.

7. Verizon acted under the guise of assisting in filling the online learning gap while actually standing to make substantial profits while putting children in harm's way and creating extreme problems and administrative headaches for schools and school staff.

8. Adding insult to injury, Verizon also charged Oklahoma schools various "Surcharges and Other Charges," not permitted by the contract, including a Universal Service Charge, an amount not applicable to the hotspots at issue here.

9. Under the FCA, a person or persons with knowledge of false or fraudulent claims against the government (a "relator") may bring an action on behalf of the federal government, state government, and themselves.

10. Plaintiff-Relator Scott Foster is an "original source" of the information underlying the Amended Complaint, as that term is used in the False Claims Acts relied on here, and has previously voluntarily disclosed to the government the information and allegations giving rise to this matter.

## II.   PARTIES

11. Relator Scott Foster is the Technology Director for Ardmore City Schools in Ardmore, Oklahoma. Mr. Foster is responsible for negotiating contracts for services such as broadband for the school district as well as for technical guidance and support to the district for such services and associated and related devices.

12. Relator Scott Foster ("Relator," "Relator Foster," or "Foster") discovered the false and fraudulent claims that are at issue in this case through his extensive work as the Technology Director for Ardmore City Schools including reviewing invoices and/or billing statements for services rendered for broadband service and devices purchased for such purpose. During the course of his work, Foster became aware of an issue regarding the broadband devices provided by Verizon and aware that the actual broadband service billed for was never provided or available to be utilized as the devices were defective and, in some instances, never connected for service.

13. Cellco Partnership D/B/A Verizon Wireless ("Verizon") is company organized in the state of Delaware and headquartered in Basking Ridge, New Jersey.

14. Verizon knew or should have known the devices they were providing through the Program were defective and anticipated replacing the said defective devices through reimbursements provided through CARES Act or other COVID-19 stimulus funding.

## III. JURISDICTION AND VENUE

15. Jurisdiction is based on 28 U.S.C. section 1331 and 31 U.S.C. section 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. sections 3729 and 3730. Under 31 U.S.C. section 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

16. Venue is proper in the Northern District of Oklahoma pursuant to 31 U.S.C. section 3732(a) because the Defendant can be found in and transacts or has transacted business in this district.

## IV. ALLEGATIONS

### A. The False Claims Act

17. The FCA was originally enacted in 1863 and was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153. Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

18. The FCA provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay

or approve false and fraudulent claims, is liable for a civil penalty for each such claim, plus three times the amount of the damages sustained by the federal Government. 31 U.S.C. § 3729.

19. The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

20. No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

21. The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. The Act requires the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time). Based on these provisions, *qui tam* plaintiff Scott Foster seeks through this action to recover all available damages, civil penalties, and other relief.

22. While the precise amount of the loss to the federal and state government cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against the defendant under the facts alleged in this Complaint amounts to millions of dollars at the very least. Plaintiff/Relator respectfully reserves the right to amend this Complaint upon the revelation of further investigatory information.

**B. Factual Overview**

23. This action has its root in the COVID-19 pandemic and resulting virtual/at-home learning for students across the country. The Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act, is a $2.2 trillion economic stimulus bill passed by the 116th U.S. Congress and signed into law by President Donald Trump on March 27, 2020, in response to the economic fallout of the COVID-19 pandemic in the United States.

24. The CARES Act additionally directed the Federal Communications Commission to establish an Emergency Broadband Benefit Program ("EBB Program"), under which low-income households could receive a discount off the cost of broadband service and certain connected devices and participating providers could receive reimbursement for such discounts.

25. Defendant Verizon utilized the federal funds provided under the CARES Act and other stimulus funding provided by the United States of America to provide (at a purportedly discounted rate) school districts and low-income households with mobile hotspot devices for broadband connectivity for the advertised purpose of providing an avenue for all students to participate in distance learning during the global COVID-19 pandemic.

26. A mobile hotspot or hotspot device is like a personal, portable router that can be used to connect to the internet with a compatible device when there are no public hotspots or Wi-Fi available. Mobile hotspots—like the devices at issue here—use a cellular signal to connect to the internet the same way a cellular telephone does, but it cannot be used it to make or receive calls.[1]

27. On May 4, 2020, the State of Oklahoma was awarded $160,950,476.00 in federal K-12 relief funding from the Elementary and Secondary School Emergency Relief (ESSER) Fund created by the CARES Act. Within that funding, the Oklahoma State Department of Education (OSDoE) was allocated a set-aside amount of $15,290,296.00 for "emergency needs" to address issues related to coronavirus. From the set-aside funds, the OSDoE purchased 50,000 Verizon Ellipsis Jetpack 900L hotspots to award to districts through a competitive grant. The OSDoE intended for these hotspots to be used to provide connectivity to students who did not have an

---

[1] *See, e.g.*, Frontier, *What is a mobile hotspot and how does it work?*, https://frontier.com/resources/what-is-mobile-hotspot (last visited Aug. 24, 2023); Verizon Wireless, *Hotspots: A comprehensive guide*, https://www.verizon.com/shop/consumer-guides/hotspots-a-comprehensive-guide (last visited Aug. 24, 2023).

internet connection at home to access online learning content for purposes of distance learning. In addition, the OSDE intended for these hotspots to be used to serve low-income students to help bridge the digital divide.

28. Specifically, in the summer of 2020, the OSDoE utilized federal funds established under the Emergency Broadband Connectivity Fund ("the Fund"), which was authorized by the Consolidated Appropriations Act ("the Appropriations Act"), to purchase the 50,000 hotspot devices that were awarded specifically under the CARES Hotspot Grant to districts across the State of Oklahoma as did other state departments of education across the country.

29. The devices provided by Verizon primarily included, but may not have been limited to, the Ellipsis Jetpack MHS900L and MHS900LS mobile hotspot devices.

30. The specific devices provided by Verizon were defective and known by Defendant to be defective (or should have been known by Defendant to be defective) as there were reports of multiple failures dating back to at least 2018, and which were eventually ordered to be recalled in their entirety by the U.S. Consumer Product Safety Commission in April 2021. Moreover, many of the hotspots were rendered useless because connectivity could never be accomplished or even signed onto through Verizon's Mobile Device Management suite, which was the mechanism by which all such connectivity was initiated by Defendant.

31. The broadband connectivity services provided for by Verizon were billed to the United States and/or customers, including, but not limited to, state governments and school districts across the entire country, even though the devices failed, if they ever properly worked at all. Further, Defendant billed for connectivity that could never be accomplished or even signed onto through its Mobile Device Management suite.

32.     Relator, in his role as Technology Director for Ardmore City Schools in Ardmore, Oklahoma, was responsible for overseeing the distribution and use of the hotspots within his school district.

33.     In August of 2020, Ardmore City Schools received 500 Verizon Ellipsis Jetpack 900L devices.  However, only 360 devices were distributed throughout the District with 50-70 of those devices unable to be enrolled in the Defendant's Mobile Device Management Suite ("MDM") and another 80-100 devices never taken out of their shipping boxes, which is in addition to still others that were defective.

34.     The action alleges that Verizon knowingly submits and/or has knowingly submitted claims to the United States (as well as, upon information and belief, numerous state departments of education and individual school districts) for not only initial CARES Act funding for the hotspots but also for payment of illegal surcharges, equipment charges, activation charges, maintenance charges, and other charges under contracts and/or federal and/or state grants to provide mobile hotspots to school districts and students throughout the United States.

35.     This action seeks reimbursement of all monies paid by the United States for such initial CARES funding and resulting illegal charges, as well as, where applicable and allowed, reimbursement of all monies paid by the affected school district(s) for such illegal charges.

36.     Based on Relator's knowledge of and experience with both broadband devices and connectivity as well as uniform billing practices implemented by telecommunications carriers, Relator alleges, on information and belief, that Verizon knowingly overcharged the United States by submitting fraudulent invoices for services that were supposed to have been rendered under the CARES Act and other stimulus funding provided in response to COVID-19, but never rendered.

**C.  The Defective Hotspots**

37.     In mid-2020, and in conjunction with pandemic stimulus programs, including the federal CARES Act, Verizon provided broadband devices that were supposed to deliver broadband communication capabilities, by and through mobile hotspots, to school districts and low-income families to assist in distance learning necessitated by the global pandemic of COVID-19.

38.     Specifically, pursuant to an agreement signed on July 7, 2020, Verizon provided the OSDoE, with 50,000 Ellipsis Jetpack 900L hotspot devices, at a price of $60.00 per device. *See* Distance Learning Initiative Agreement, attached as **Exhibit A** (hereinafter, "the Agreement").[2]

39.     The Agreement likewise required the OSDoE to pay a $10.00 base monthly access fee for all 50,000 devices. *Id.* ("OSDoE must maintain a minimum of 50,000 unit activations at all times on the $10.00 Unlimited 4G LTE Data for Tablets and MiFi Jetpacks plan (or higher).").

40.     However, at the time of this transaction, Verizon knew—or deliberately ignored, or recklessly disregarded—that the devices were defective in that they had significant overheating issues causing heat-related damage.  On information and belief, the defect in the device was known to Verizon as early as 2018 and, eventually, in April 2021, 100% of the hotspots—some 2.5 million devices—were ordered to be recalled by the U.S. Consumer Product Safety Commission.[3]

41.     Specifically, the April 2021 recall notes that "[t]he lithium ion battery in the hotspots can overheat, posing fire and burn hazards," and further reports that "Verizon has received 15 reports of devices overheating, including six reports of fire damage to bedding or flooring and two reports of minor burn injuries." *Id.*

---

[2] The Agreement incorporates by reference and is subject to the terms of "statewide contract 1012V", attached hereto as **Exhibit B**.

[3] U.S. Consumer Product Safety Commission, *Verizon Recalls 2.5 Million Ellipsis Jetpack Mobile Hotspots Imported by Franklin Wireless Due to Fire and Burn Hazards* (April 8, 2021), *available at* https://www.cpsc.gov/Recalls/2021/Verizon-Recalls-2-5-Million-Ellipsis-Jetpack-Mobile-Hotspots-Imported-by-Franklin-Wireless-Due-to-Fire-and-Burn-Hazards

42. The Jetpacks were equipped with a standard lithium-ion, or Li-ION, battery, bearing Model Name V604454AR. The battery measures 55.90 x 43.90 x 6.40 millimeters.

43. The lithium-ion batteries in the Jetpacks were defective because they were prone to overheat rapidly and without warning to the end-user. This overheating would cause the battery to leak, spark, catch fire, burn, explode, or otherwise combust, and could cause serious injury.

44. Indeed, a currently pending securities class action lawsuit against the manufacturer of the Verizon Ellipses Jetpack 900L hotspot devices—Franklin Wireless Corp.—details the long history of complaints and issues with the devices, including that the manufacturer, Franklin Wireless, "fielded several complaints about the Jetpacks' overheating issues from Verizon," and that "[b]etween June 2018 and September 2019, Franklin received a constant flow of Jetpacks with battery issues from Verizon." *Ali et al. v. Franklin Wireless Corp. et al.*, Case No: 3:21-cv-00687, ECF No. 26 at ¶¶ 34-49 (the "*Franklin Securities Case*").

45. Allegations there further demonstrate that Verizon's return rate of the devices was more than double the industry standard. *Id.* ¶ 42.

46. Indeed, according to allegations in the *Franklin Securities Case*, the Ellipses Jetpacks "were not designed for round-the-clock use, nor were they designed to serve as a hotspot for an entire household of users. Instead, the Jetpacks were designed for a 'niche market;' that is, for use by professionals or students for only a couple of hours per day while away from home, as 'a hotspot for a mobile user, enjoying their Wi-Fi hotspot' while away from home. [The Witness] explained that Jetpacks are 'devices for mobile use,' and a Jetpack is not 'a 24-hour use device.'" *Id.* at ¶ 56.

47. It is little wonder then, that the devices failed Oklahoma's schoolchildren. Verizon, having had years of issue-laden experience with these very devices, including innumerable returns

related to overheating, sold them to the state of Oklahoma and other states and school boards across the country, knowing full well they were defective and not fit for the purpose they were to be used, of all-day remote learning.

### D. The Mobile Device Management Suite

48. All hotspots supplied to schools by Verizon utilized Verizon's Mobile Device Management (MDM) software suite.

49. Verizon's MDM allows schools to monitor all devices given to students. It is essential that all hotspot devices given to students be enrolled in Verizon's MDM. Enrollment in Verizon's MDM is the *only* manner in which a school can control and monitor how a hotspot is being utilized by a student. A hotspot device must be enrolled in Verizon's MDM to allow a school to monitor data consumption. Enrollment in Verizon's MDM is the mechanism that allows a school to safeguard that a hotspot device is being used to connect to the internet for school purposes and not being misused for personal entertainment.

50. The Children's Internet Protection Act (CIPA) requires schools to create and implement an internet safety policy. Schools must certify enforcement of the policy:

> A certification under this subparagraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school:
>
> (i) is enforcing a policy of Internet safety for minors that includes monitoring the online activities of minors and the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are:
>
> > (I) obscene;
> >
> > (II) child pornography; or
> >
> > (III) harmful to minors;

>> (ii) is enforcing the operation of such technology protection measure during any use of such computers by minors; and
>
> (iii) as part of its internet safety policy is educating minors about appropriate online behavior, including interacting with other individuals on social networking websites and in chat rooms and cyberbullying awareness and response.

47 U.S.C.A. § 254(h)(5)(B) and 47 C.F.R. § 54.520.

51. Thus, monitoring students' internet activity is not a choice for a school; it is a requirement of federal law and was also required by the Agreement. *See* Exh A. ("OSDoE will use best efforts to make sure data usage is solely used for educational application purposes only (i.e. to limit service from being used for non-educational purposes and access to the open Internet.").

52. Enrollment in Verizon's MDM was the only means schools could monitor and manage the use of the hotspot devices given to students. Enrollment in Verizon's MDM was the only means schools could provide a hotspot device to a student and be CIPA compliant. Without enrollment in Verizon's MDM a school had no way of controlling the internet content accessed by a student through a hotspot. Therefore, the school could not certify CIPA compliance.

53. As Technology Director for Ardmore City Schools, Relator was responsible for enrolling all Verizon hotspots in Verizon's MDM.

54. Upon investigation, Relator Foster discovered that of the 500 devices provided to the Ardmore City School District only 360 devices were distributed throughout the District with 50-70 of those devices unable to be enrolled in the Defendant's Mobile Device Management Suite ("MDM") and another 80-100 devices never taken out of their shipping boxes, which is in addition to still others that were defective.

55. Yet Defendant billed the District at the rate of $10.00 per month, plus FCC/USAC fees, for each of the 500 devices purchased by the District, payment for which was provided to the

District through the federally funded CARES Hotspot Grant, even though they knew all devices were not brought into use or were not able to accomplish connectivity and presented extreme hazard and safety concerns due to overheating.  This further caused individual school districts around the country, which made up the millions of hotspot recipients, to incur substantial financial damages aimed at attempting to manage, troubleshoot, or remedy the defective devices, in addition to subjecting them to potential tort liability should one or more devices overheat and cause a fire.

56. On information and belief, Relator alleges that Defendant has submitted similar fraudulent billing statements to school districts and low-income families across the State of Oklahoma and the Nation.  In fact, it is believed that numerous states, including Massachusetts, Texas, Georgia, and others had similar agreements with Defendant for the provision of the same or similar devices and services that covers millions of students in total.

### E. Improper Surcharges

57. Under the terms of the Agreement between Verizon and the OSDoE, Verizon promised to provide unlimited data per device at a monthly cost of $10.00 per device.  In exchange, OSDoE agreed to maintain at least 50,000 unit activations at all times.

58. Nothing in the Agreement allowed Verizon to submit claims for additional fees or surcharges.

59. Despite not being allowed under the terms of the Agreement, Verizon submitted claims to school districts for "Surcharges and Other Charges."

60. Schools had no way of knowing whether Verizon was properly billing them because schools did not have access to the Agreement.

61. Schools relied on Verizon to submit proper bills.

62. Every month during the term of the Agreement Verizon knowingly charged schools surcharges and fees that were not authorized by the Agreement.

63. Additionally, even if the Agreement allowed surcharges the surcharges would still be improper.

64. In each monthly bill submitted to schools by Verizon, Verizon provided the following statement:

> **Explanation of Surcharges**
> Surcharges include (i) a Regulatory Charge (which helps defray various government charges we pay including government number administration and license fees); (ii) a Federal Universal Service Charge (and, if applicable a State Universal Service charge) to recover charges imposed on us be the government to support universal service; and (iii) an Administrative Charge, which helps defray certain expenses we incur, including: charges we, or our agents, pay local telephone companies for delivering calls from our customers to their customers; fees and assessments on our network facilities and services; property taxes; and the costs we incur responding to regulatory obligations.

65. Relator's investigation has determined that Federal Universal Service Charges are not charged to hotspots. Federal Universal Service Charges are only allowed to be charged for telecommunication services. Hotspots are merely data transfer devices and are not considered to be telecommunication devices.

66. It would be equally improper for Verizon to charge schools any form of a tax. Schools are tax exempt pursuant to Okla. Stat. tit. 68 § 1356.

67. Verizon's surcharges were not allowed under the Agreement and not allowed by law. Verizon knew it was improper to surcharge schools for hotspots; yet, wrongly did so.

## V. CLAIMS

### COUNT I:
### VIOLATIONS OF FALSE CLAIMS ACT 31 U.S.C. Sections 3729(a)(1) and (a)(2)

68. Relator realleges and incorporates by reference the allegations contained in preceding paragraphs of this Complaint

69. This is a claim for treble damages and penalties under The False Claims Act, 31 U.S.C. section 3729, *et seq.*, as amended.

70. By virtue of the acts described above, Verizon knowingly presented or caused to be presented, false or fraudulent claims to the United States for payment or approval through submission of the false or fraudulent claims to Ardmore City School District, other school districts across the State of Oklahoma and other states, and to low-income families within the State of Oklahoma and other states across the country.

71. By virtue of the acts described above, Verizon knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to induce the United States to approve and pay such false or fraudulent claims. This was all done to increase Verizon's ultimate profitability and amounts to taking unfair advantage of the global pandemic, the needs created thereby, the CARES Act, and other government programs.

72. Based on information and belief, each claim for payment described in this Complaint was presented to the United States, state governments, school districts and low-income households within the State of Oklahoma and across the country who were recipients of federal funds, through reimbursement or grant programs, provided by the federal government through the CARES Act and/or other federal stimulus programs funded in response to the global pandemic resulting from COVID-19.

73. Based on information and belief, Verizon was reimbursed, through CARES Act and/or other federally funds provided as stimulus necessitated by COVID-19, for the provision of original devices and/or repair and/or replacement of defective devices sold to school districts and

low-income households knowing, or having cause to have known, the devices utilized under the federal programs were defective.

74.     Plaintiff cannot at this time identify all the false or fraudulent claims for payment that have been caused by Defendant's conduct. Defendant and the United States, through school districts and low-income households within the State of Oklahoma and across the country, have within their possession the records that demonstrate the false or fraudulent claims and the amount of money improperly paid to Verizon.

75.     The United States, unaware of the false or fraudulent records, statements, and claims made or caused to be made by Defendant, paid and/or reimbursed and continues to pay and/or reimburse the claims that would not be paid but for Defendant's false, fraudulent, and illegal practices.

76.     The United States reimbursed Defendant for the defective devices Defendant knew, or should have known, were defective prior to Defendant providing the defective devices to school districts and low-income households within the State of Oklahoma and across the country.

77.     Verizon's primary goal in providing hotspots to schoolchildren was furthering its own profits and financial gain.

78.     By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## **PRAYER**

**WHEREFORE**, Relator prays for judgment against Defendant as follows:

1. That Defendant cease and desist from violating 31 U.S.C. section 3729, *et seq.*;

2. That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty for each violation of 31 U.S.C. section 3729;

3. That Relator be awarded the maximum amount allowed pursuant to section 3730(d) of The False Claims Act;

4. That Relator be awarded all costs of this action, including attorneys' fees, costs, and expenses, and interest;

5. That Relator be allowed leave to amend as investigation and/or discovery reveals further specific information; and

6. That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

Dated:  August 25, 2023

Respectfully submitted,

*/s/ Brad Barron*
Bradford D. Barron, OBA #17571
**The Barron Law Firm, PLLC**
PO Box 369
Claremore, OK 74017
(918) 341-8402 phone
(918) 515-4691 fax
bbarron@barronlawfirmok.com

Patrick A. Barthle II
Florida Bar No.: 0099286
**Morgan & Morgan Complex Litigation Group**
One Tampa City Center
201 North Franklin Street, 7th Floor

17

Tampa, FL 33602
Telephone: (813) 229-4023
Facsimile: (813) 222-2496
pbarthle@ForThePeople.com

*Attorneys for Relator*


**SMITH BARKETT LAW GROUP, PLLC**
David R. "Rusty" Smith, OBA #19575
Michael L. Barkett, OBA #16171
Dan Medlock, OBA #20092
James E. Walters, OBA #19964
**Smith Barkett Law Group, PLLC**
P.O. Box 767
Muskogee, OK 74402-0767
Telephone: (918) 912-2000
Fax: (918) 912-2122
Email: rsmith@smithbarkett.com
 dmedlock@smithbarkett.com
mbarkett@barkettlaw.net
*Attorneys for Plaintiff/Relator Scott Foster*

ATTORNEY LIEN CLAIMED

18

## **CERTIFICATE OF SERVICE**

I certify that on August 25, 2023, I served a copy of the foregoing to the Clerk of the Court via the ECF system for filing and transmittal to all counsel of record in this case.

*s/ Brad Barron*
Bradford D. Barron
