# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, *ex rel.*
SCOTT FOSTER,

        Plaintiff,

v.

                                 **Case No. 21-CV-166-TCK-MTS**

CELLCO PARTNERSHIP D/B/A
VERIZON WIRELESS,

        Defendant.

---

## DEFENDANT'S MOTION TO DISMISS RELATOR'S AMENDED COMPLAINT

John D. Russell, OBA No. 13343
GABLEGOTWALS
110 North Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120-1495
Telephone: (918) 595-4800
*jrussell@gablelaw.com*

-and-

Michael Francisco, *pro hac vice*
Charles Wm. McIntyre, *pro hac vice*
Edwin O. Childs, Jr., *pro hac vice*
Michael A. Brody, *pro hac vice*
MCGUIREWOODS, LLP
888 16th Street N.W., Suite 500
Washington, DC 20006
Telephone: (202) 857-1700
*mfrancisco@mcguirewoods.com*
*cmcintyre@mcguirewoods.com*
*echilds@mcguirewoods.com*
*mbrody@mcguirewoods.com*

COUNSEL FOR DEFENDANT
VERIZON COMMUNICATIONS, INC.

DATED: October 23, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

RELATOR'S ALLEGATIONS AND PROCEDURAL HISTORY ............................................. 4

STANDARD OF REVIEW ....................................................................................................... 7

ARGUMENT .............................................................................................................................. 8

I.      RELATOR FAILS TO PLEAD A VIOLATION OF THE FALSE CLAIMS ACT......... 8

      A.      Relator Fails to Plead A False Statement or Fraudulent Course of Conduct......... 8

            1.      Relator Does Not Plead Facts to Support A Factual Falsity Theory ......... 9

            2.      Relator Does Not Plead Facts to Support a Legal Falsity Theory ........... 12

      B.      The Amended Complaint Lacks Sufficient Allegations of Scienter.................... 15

      C.      The Amended Complaint Fails to Plead Materiality ........................................... 17

      D.      The Amended Complaint Fails to Plead Fraud With Particularity ...................... 20

II.     RELATOR IS NOT AN ORIGINAL SOURCE ........................................................... 23

CONCLUSION....................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ali et al. v. Franklin Wireless Corp. et al.*,
   Case No: 3:21-cv-00687 (S.D. Cal.) .......................................................................25

*U.S. ex rel. Ambrosecchia v. Paddock Labs., LLC*,
   855 F.3d 949 (8th Cir. 2017) ................................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................7

*Aslam v. U.S. Dept. of State*,
   No. 2:22-CV-00701, 2023 WL 6163969 (D. Utah Sept. 21, 2023) ....................11, 24

*U.S. ex rel. Barrick v. Parker-Migliorini Int'l, Inc.*,
   2015 WL 9412537 (D. Utah Dec. 22, 2015) ...........................................................22

*Bishop v. Wells Fargo & Co.*,
   823 F.2d 35 (2d Cir. 2016), vacated on other grounds, 137 S. Ct. 1067 (2017) .......9

*U.S. ex rel. Boggs v. Bright Smile Family Dentistry, P.L.C.*,
   2013 WL 1688898 (W.D. Okla. 2013) ....................................................................16

*U.S. ex rel. Brooks v. Stevens-Henager Coll.*,
   305 F. Supp. 3d 1279 (D. Utah 2018) ....................................................................22

*U.S. ex rel. Burlbaw v. Orenduff*,
   548 F.3d 931 (10th Cir. 2008) ...............................................................................15

*U.S. ex rel. Clark v. UnitedHealth Grp., Inc.*,
   2016 WL 9777207 (D.N.M. Sept. 22, 2016) ...........................................................20

*U.S. ex rel. Complin v. N. Carolina Baptist Hosp.*,
   818 F. App'x 179 (4th Cir. 2020) ...........................................................................16

*D'Agostino v. ev3, Inc.*,
   845 F.3d 1 (1st Cir. 2016) ......................................................................................19

*U.S. ex rel. Dunn v. Procarent, Inc.*,
   615 F. Supp. 3d 593 (W.D. Ky. 2022) ....................................................................17

*U.S. ex rel. Ernst v. HCA Healthcare, Inc.*,
   2020 WL 6868775 (D. Kan. Nov. 23, 2020) (unpublished) ....................................22

*Fernandez v. Clean House, LLC*,
    883 F.3d 1296 (10th Cir. 2018) ...........................................................................23

*U.S. ex rel. Fowler v. Caremark RX, L.L.C.*,
    496 F.3d 730 (7th Cir. 2007) ...............................................................................17

*U.S. ex rel. Grupp v. DHL Worldwide Exp., Inc.*,
    604 Fed. App'x 40 (2d Cir. 2015).........................................................................13

*HollyFrontier Cheyenne Ref'g, LLC v. Renewable Fuels Ass'n*,
    141 S. Ct. 2172 (2021).............................................................................................1

*United States ex rel. Hubert v. Bd. of Educ. of City of Chicago*,
    No. 16 C 4336, 2018 WL 6248827 (N.D. Ill. Nov. 29, 2018)...............................19

*U.S. ex rel. Janssen v. Lawrence Mem'l Hosp.*,
    949 F.3d 533 (10th Cir. 2020) ...................................................................8, 18, 19

*Kinney v. Stoltz*,
    327 F.3d 671 (8th Cir. 2003) .................................................................................9

*U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*,
    756 F.3d 1075 (8th Cir. 2014) .............................................................................23

*U.S. ex rel. Lemmon v. Envirocare of Utah*,
    614 F.3d 1163 (10th Cir. 2010) ...........................................................................20

*Colorado and U.S. ex. rel. Lovato v. Kindred Healthcare, Inc.*,
    2021 WL 1085423 (D. Colo. Mar. 22, 2021) ......................................................20

*U.S. ex rel. Polukoff v. St. Mark's Hosp.*,
    895 F.3d 730 (10th Cir. 2018) ...................................................................8, 9, 12

*U. S. ex rel. Provuncher v. Angioscore, Inc.*,
    2012 WL 3144885 (D. Mass. Aug. 3, 2012) .........................................................3

*U.S. ex rel. Reed v. Keypoint Government Solutions*,
    923 F.3d 729 (10th Cir. 2019) .............................................................................23

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
    565 F.3d 683 (10th Cir. 2009) .............................................................................11

*U. S. ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 ...................................................................................................3, 17

*Schwartz v. Celestial Seasonings, Inc.*,
    124 F.3d 1246 (10th Cir. 1997) ...........................................................................22

*U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*,
   472 F.3d 702 (10th Cir. 2006) (abrogated on other grounds)..............................................7, 22

*U.S. ex rel. Simpson v. Leprino Foods Dairy Prods. Co.*,
   2018 WL 1375792 (D. Colo. Mar. 19, 2018) ..........................................................................16

*U.S. ex rel. Steuert v. L3 Harris Techs.*,
   2022 WL 970187 (D.N.J. Mar. 31, 2022), *appeal dismissed sub nom. Steuert
   v. L-3 Commc'ns Corp.*, 2023 WL 421006 (3d Cir. Jan. 26, 2023) ........................................15

*In re: Syngenta AG Mir 162 Corn Litig.*,
   2016 WL 5851795 (D. Kan. Oct. 6, 2016) ...............................................................................23

*Universal Health Servs. Inc. v. U.S. ex rel. Escobar*,
   579 U.S. (2016)................................................................................................................ *passim*

*U.S. ex rel. Wagner v. Care Plus Home Health Care, Inc.*,
   2017 WL 6329850 (N.D. Okla. Dec. 11, 2017).......................................................................20

*U.S. ex rel. Westrick v. Second Chance Body Armor*,
   128 F. Supp. 3d 1 (D.D.C. 2015) ............................................................................................12

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 ...........................................................................................................................13

**Statutes**

CARES Act.................................................................................................................................4, 21

False Claims Act ..................................................................................................................... *passim*

47 U.S.C. § 153..............................................................................................................................14

47 U.S.C. § 254.....................................................................................................................3, 13, 14

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...................................................................................................................7

Fed. R. Civ. P. 9(b) ................................................................................................................. *passim*

Fed. R. Civ. P. 12(b)(5)...................................................................................................................3

Fed. R. Civ. P. 12(b)(6)...................................................................................................................3

At the height of the COVID-19 pandemic, many schools closed and had to adopt remote learning practices on the fly. The federal government and various state governments enacted programs to keep schools operating. Here, the State of Oklahoma contracted with Verizon to facilitate distance learning by supplying devices that provided internet access. *See* Oklahoma State Department of Education Cares Hotspot Grants, Ex. A.[1] Oklahoma's distance learning program aimed to provide K-12 students with the opportunity to participate in remote learning during the pandemic through internet connectivity. *Id.* As part of the distance learning process, the Oklahoma State Department of Education ("OKSDOE") used federal Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") money to purchase 50,000 Ellipsis Jetpack 900L mobile cellular broadband devices (the "Devices") and based the terms of the purchase on a pre-existing statewide contract with Verizon.[2] The contract between the OKSDOE and Verizon required Verizon to deliver the Devices directly to the school districts within the State. *Id.* at 3.

The Amended Complaint must be dismissed for failure to plead any element of a false claim under the federal False Claims Act ("FCA"), 31 U.S.C. §3729(a): there is no false claim, no alleged material falsity, no false claim that Verizon had knowledge of, and no material harm to the OKSDOE or any school district. Each of these flaws is an independent ground for dismissal. Relator also lacks the personal knowledge necessary to qualify as an "original source."

On its own terms, this is a purported False Claims Act case about just a handful of the 50,000 Devices. Relator Scott Foster, an administrator at one of Oklahoma's more-than 500 school

---

[1]Available at   https://sde.ok.gov/sites/default/files/CARES%20Act%20Hotspot%20Grants.pdf (last visited October 11, 2023). The Court may take judicial notice of this document, which is available on the State of Oklahoma's website and appears used in the Amended Complaint. *See HollyFrontier Cheyenne Ref'g, LLC v. Renewable Fuels Ass'n,* 141 S. Ct. 2172 (2021).
[2]Available at https://www.ok.gov/dcs/solicit/app/solicitationDetail.php?solID=3954 (last visited October 11, 2023).

districts, only has personal knowledge about a mere one percent (1%) of the Devices, at most, namely the 500 Devices received by the Ardmore School District. Even as to this small fraction, however, Relator fails to identify a single defect in any device or any false claim.

Relator instead alleges, generally and vaguely, that similar products elsewhere *might* have had issues with overheating, which is apropos of nothing other than perhaps a warranty issue. Any false claim to the government must start with a *false* claim. Pointing to alleged problems with a small number of similar products used elsewhere does not suffice. Alleged flaws in the Devices outside the District would be like a relator claiming that the sale of a few hundred Ford F-150 pickups to Oklahoma, using a federal grant, represents a fraudulent claim because a handful of Fords sold to someone else in Vermont had a defective starter. Similarly, Relator here completely fails to allege a false claim related to Verizon's provision of the 500 Devices.

Perhaps recognizing the weakness of any direct false claim theory, Relator makes passing reference to Verizon's billing for cellular broadband service for the Devices. This fallback theory, advanced in detail in the Amended Complaint, also falls well short. Critically, nowhere does Relator allege that Verizon failed to provide the District with the wireless services that it invoiced for, or violated some legal or contractual provision. Instead, the Amended Complaint admits that the District received exactly the Devices and SERVICES it expected and for which it contracted.

At most, Relator complains that just a handful of the Devices Verizon delivered to the District might have had some vague, technical difficulty functioning in all possible conditions. Far from a false claim, Relator describes only commonplace challenges with consumer electronic products. Sometimes a small number of products need troubleshooting or suffer some technical anomaly that can be addressed in the normal course, either by replacement or repair. Relator's alleged circumstances do not support a *qui tam* claim. IT challenges are not *qui tam* claims.

Relator's theory of "any-miniscule-technical-defect-is-fraud" would be an unprecedented expansion of the FCA's standards, which "[o]n their face and at common law […] focus primarily on what [the defendant] thought and believed." *U. S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751. Ed. 2d 1 (2023). Just as another federal district court explained, sophisticated devices "almost inevitably will be subject to a statistically predictable failure rate," and that failure "is not the evil that Congress sought to root out by passage of the False Claims Act." *U. S. ex rel. Provuncher v. Angioscore, Inc*., 2012 WL 3144885, at *2 (D. Mass. Aug. 3, 2012). Consequently, the Amended Complaint fails under Rules 12(b)(5), 12(b)(6), and 9(b).

Relator's Amended Complaint fails to fix any of these problems. Relator's case is fundamentally still a product warranty case masquerading poorly as an FCA case. The Amended Complaint devotes 11 paragraphs to general allegations that Verizon's billing for certain surcharges was improper because, according to Relator, the contract did not permit Verizon to seek reimbursement for those charges. *See* Am. Compl. ¶¶ 57-67. These allegations are insufficient to support Relator's claim. First, Relator misstates the contractual requirements, which were based on a pre-existing statewide contract with Verizon.[3] Second, the Amended Complaint attempts to allege that FCC regulations did not permit certain surcharges. But Relator misstates the controlling law that does *allow* for surcharges.[4]

---

[3] Oklahoma Statewide Contract No. SW1012V (available at: https://www.ok.gov/dcs/solicit/app/solicitationDetail.php?solID=3954 (last visited October 10, 2023); *incorporating by reference* Verizon Wireless Pricing Sheet Western States Contracting Alliance Contract for Services #1907 (available at: https://www.phoenix.gov/policesite/Documents/104782.pdf (last visited October 10, 2023)

[4] Section 254(d) applies not only to "every telecommunications carrier that provides interstate telecommunications services" but also to certain "other provider[s] of interstate telecommunications." 47 U.S.C. § 254(d). The FCC has determined that both mobile services and private line services are subject to Federal Universal Service Fund ("FUSF") Contribution. *See Form 499 Instructions* at 28. at https://docs.fcc.gov/public/attachments/DA-19-84A3.pdf

### RELATOR'S ALLEGATIONS AND PROCEDURAL HISTORY

*Allegations.* On May 4, 2020, the OKSDOE was awarded federal funding from the Elementary and Secondary School Emergency Relief Fund created by the CARES Act. *See* Ex. A*; see also* Am. Compl. ¶ 27. The OKSDOE set aside $15,290,296.00 of these funds for "emergency needs" related to COVID-19. *Id*. Using these funds, the OKSDOE purchased broadband devices for students who had no internet connectivity in their home. *Id.* With these funds, Relator alleges that the OKSDOE purchased the Devices from Verizon, which would be awarded to individual school districts through a competitive grant process. *Id.*; *see also* Am. Compl. ¶27.

Although Relator never fully explains the process by which the Devices were distributed to the school districts, he alleges that "[d]uring the course of his work, [he] became aware of an issue regarding the broadband devices provided by Verizon." Am. Compl. ¶ 12. To that end, and *without any detail*, Relator alleges that he became "aware that the actual broadband service [Verizon] billed for was never provided or available to be utilized as the devices were defective and, in some instances, never connected for service." Am. Compl. ¶ 12. Relator alleges that "[u]pon investigation" he "discovered that of the 500 Devices provided to the Ardmore City School District[,] only 360 Devices were distributed throughout the District with 50-70 of those Devices unable to be enrolled in [Verizon's] Mobile Device Management Suite ('MDM') and another 80-100 Devices never taken out of their shipping boxes, which is in addition to still others that were defective." Am. Compl. ¶ 54.

Relator generally alleges that he "is responsible for negotiating contracts for services such as broadband for the school district, as well as for technical guidance and support to the district for such services and associated and related devices." Am. Compl. ¶ 11. Yet, despite his claimed "extensive work," Relator offers few specifics regarding Verizon's activities or the Devices

themselves. Relator alleges only generally that "Verizon knew—or deliberately ignored, or recklessly disregarded—that the devices were defective in that they had significant overheating issues causing heat-related damage." Am. Compl. ¶ 40. Relator never says how many—if any—of the 500 Devices provided to the District actually had an overheating issue. Relator only notes that "[o]n information and belief, the defect in the device was known to Verizon as early as 2018," without any particularity. Am. Compl. ¶ 40. Relator also notes that the Devices were recalled by the Consumer Product Safety Commission in 2021 (Am. Compl. ¶ 40 & n.3), but that was well after the contracts at issue were executed and the devices were supplied.

Then, without any explanation as to whether he even saw a single Verizon bill, or any of the relevant detail of the bills, Relator simply states that "[b]ased on [his] knowledge of and experience with both broadband devices and connectivity as well as uniform billing practices implemented by telecommunications carriers[,]" that "on information and belief, [] Verizon knowingly overcharged the United States by submitting fraudulent invoices for services[.]" Am. Compl. ¶ 36. No specifics or copies of actual invoices are included.

Relator then alleges that Verizon billed the District at the rate of $10 per month for each of the 500 Devices the District purchased plus FCC/USAC fees. Am. Compl. ¶ 55.[5] Relator suggests it was improper for Verizon to bill the District, because Verizon "knew all devices were not brought into use or were not able to accomplish connectivity and presented extreme hazard and safety concerns due to overheating." Am. Compl. ¶ 55. Relator suggests that these bills amounted to an "overcharge," because they represent—as he puts it—services "never rendered." Am. Compl. ¶ 36. Without alleging that any of the 500 Devices caused harm to anyone in the District or

---

[5] The OKSDOE actually purchased the Devices and then directed the distribution to the school districts. *See* supra n.3.

anywhere in Oklahoma, Relator broadly alleges "that the devices failed Oklahoma's schoolchildren[,]" Am. Compl. ¶ 47. Relator does not allege a single fact explaining how the Devices "failed" *in Oklahoma,* or what he even means by the term "failed." Instead, Relator states that "millions of hotspot recipients […] incur[red] substantial financial damages aimed at attempting to manage, troubleshoot, or remedy the defective devices[.]" Am. Compl. ¶ 55. But, Relator does not allege that either he has knowledge of these purported damages suffered across the nation. Nor does Relator specify to which devices he is referring, whether Verizon provided them, or whether they have any relevance to the *Oklahoma* distance learning program.

Relator never identifies any specific number of Devices that could not connect to the internet (let alone why those devices did not connect to the internet). In fact, even if every allegation in the Amended Complaint is taken as true, it is possible that every single one of the 500 Devices provided to the District was capable of connecting to the internet or did in fact connect to the internet. The only specific allegation about the 500 Devices involves District activity unknown to Verizon and beyond its control, for example, the claim that some number of Devices were allegedly being left in boxes by the District after delivery to the District. Verizon had no control over how the District used or unboxed the Devices. Likewise, Relator alleges that 50-70 Devices had trouble connecting to Verizon's Mobile Device Management ("MDM"). Am. Compl. ¶ 33. Relator alleges that enrollment in the MDM was an essential feature of the contract, because, according to Relator, it was the only way the school could monitor whether the Devices were being used for "educational application purposes only." Am. Compl. ¶¶ 48-52. But, Relator never connects the MDM to the central question: can the Devices connect students to the internet? The allegation is lacking particularity here for good reason. MDM is an *optional* administrative tool and mobile cellular broadband devices are capable of connecting students to the internet even if

MDM does not function normally.[6] Here, Relator does not allege that the contract *required* that the Devices *be enrolled* in the MDM. Relator does not, because he cannot.

 *Procedural History.* Relator filed this *qui tam* action in April 2021, asserting a single count under the False Claims Act, 31 U.S.C. § 3729. ECF No. 2. The original Complaint remained under seal until December 21, 2022, when the government declined to intervene. ECF No. 14. On June 20, 2023, Defendant moved to dismiss Relator's Complaint. ECF No. 36. In response, on August 25, 2023, Relator filed an Amended Complaint. ECF No. 40. On October 2, 2023, Verizon moved to stay discovery pending resolution of the motion to dismiss. ECF No. 44.

**STANDARD OF REVIEW**

 The Federal Rules require dismissal of a Complaint if the plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Fraud claims, including FCA claims, must satisfy the heightened pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726-727 (10th Cir. 2006) (abrogated on other grounds) (internal quotation marks omitted).

---

[6] See https://www.verizon.com/business/resources/flyer/2021/manage-the-mobile-devices-across-your-organization.pdf (describing MDM); *see also* What Is Mobile Device Management, available at https://www.vmware.com/topics/glossary/content/mobile-device-management.html (explaining MDM is a tool used to "automate, control, and secure administrative policies on laptops, smartphones, tablets, or any other device connected to an organization's network.")

7

**ARGUMENT**

**I.     RELATOR FAILS TO PLEAD A VIOLATION OF THE FALSE CLAIMS ACT**

Section 3729(a) of Title 31 prohibits making false or fraudulent claims for payment to the United States. It makes any person liable who "knowingly presents, or causes to be presented, a false or fraudulent claim for approval," §3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," §3729(a)(1)(B). To allege a plausible FCA claim under § 3729, a plaintiff must plead facts capable of establishing the following elements: "(1) a false statement or fraudulent course of conduct; (2) made with the requisite scienter; (3) that is material; and (4) that results in a claim to the Government or conceals, decreases, or avoids an obligation to pay the Government." *U.S. ex rel. Janssen v. Lawrence Mem'l Hosp.,* 949 F.3d 533, 539 (10th Cir. 2020) (citation omitted).

The Amended Complaint fails to plausibly allege that Verizon submitted or caused to be submitted any *false* claim for payment to the government.

**A.     Relator Fails to Plead A False Statement or Fraudulent Course of Conduct**

Relator fails to allege that (1) Verizon did not provide the devices that it billed for, (2) that Verizon violated a federal law or regulation, or (3) that Verizon violated a term of its contract with Oklahoma. As a result, Relator fails to allege that Verizon's claims for reimbursement were "false." False or fraudulent claims include "both factually false and legally false requests for payment." *U.S. ex rel. Polukoff v. St. Mark's Hosp.,* 895 F.3d 730, 741 (10th Cir. 2018). "Factually false claims generally require a showing that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* "Claims arising from legally false requests, on the other hand, generally require knowingly

8

false certification of compliance with a regulation or contractual provision as a condition of payment." *Id.* The Amended Complaint fails under both theories.[7]

### 1.   Relator Does Not Plead Facts to Support A Factual Falsity Theory

Relator's theory of fraud, as best as can reasonably be determined, is premised on factual falsity—i.e., what he perceives to be Verizon's failure to provide conforming goods. This type of claim arises, for example, when a government contractor claims it provided certain goods, but those goods were not as promised. *See Bishop v. Wells Fargo & Co.,* 823 F.2d 35, 43 (2d Cir. 2016), vacated on other grounds, 137 S. Ct. 1067 (2017) ("[t]he archetypal FCA claim involves a factually false request for payment from the government, as when a contractor delivers a box of sawdust to the military but bills for a shipment of guns.").

Although Relator vaguely states that some unknown number of the Devices were defective, his allegations fail to support that conclusion. With respect to the 500 Devices about which Relator claims personal knowledge, Relator alleges:

- that only 360 out of the 500 Devices were distributed in the District,

  - that 50-70 of those 360 Devices could not be enrolled in Verizon's MDM;

- that another 80-100 Devices were never taken out of their shipping boxes; and

- that an unstated number of "others [] were defective." Am. Compl. ¶ 33.

First, Relator's vague allegation that 80-100 of the Devices were never taken out of their shipping boxes does not in any way suggest the Devices were problematic or that Verizon did not deliver them. Relator does not cite any provisions of the contractual arrangement identifying what,

---

[7] Even if Relator could allege a false statement or course of conduct in the Amended Complaint, his knowledge is limited to the 500 Devices provided to the District. *See Kinney v. Stoltz,* 327 F.3d 671, 674 (8th Cir. 2003) (explaining that a relator must have "personal knowledge of the facts relating to the alleged scheme or fraud against the government in order to bring a lawsuit.")

if any, commitments Verizon might have had to distribute the Devices throughout the State or if Verizon was only required to sell and deliver the Devices to individual school districts. Naturally, Relator cannot identify any requirement that Verizon could only submit claims for reimbursement if the Devices *were actually used*. If anything, the Amended Complaint suggests that it was the District's own choice not to unpack the Devices. If indeed the Devices were never taken out of the box, Relator presumably cannot know if the Devices were functional. In fact, the State's public pronouncement regarding the purchase of the Devices indicates that "Districts are responsible for payment of the monthly service fee regardless of whether the device is being used." *See* Ex. A.

Second, Relator alleges that 50-70 of the Devices were unable to be enrolled in Verizon's Mobile Device Management ("MDM") system. Relator identifies no additional details concerning efforts to enroll these specific Devices; leaving open the possibility that it was user error. Although Relator identifies the MDM suite as "the mechanism by which all such connectivity was initiated by Defendant[,]" Am. Compl. ¶ 30, Relator does not affirmatively state that these 50-70 Devices were unable to *connect to the Internet*. In the Amended Complaint, Relator alleges that enrollment in the MDM was an essential feature of the contract, because, according to Relator, it was the only way the District could monitor whether the Devices were being used for "educational application purposes only." Am. Compl. ¶¶ 48-52. But, Relator concedes in the Amended Complaint that the contract required only that *the District* use its "best efforts" to monitor the use of the Devices, Am. Compl. ¶ 51, not that Verizon was obligated to ensure that the Devices could connect to the MDM.

Third, Relator vaguely asserts "other[] [devices] that were defective," but, in doing so, fails to provide even the most basic notice to Verizon as to what Relator is trying to allege. Relator cannot simply state that the Devices were "defective" without even trying to explain how they

were defective. Verizon, and the Court, cannot be left to guess what the defect was, how many

Devices were defective, or what legal or contractual obligation was violated.

Fourth, Relator generally and inaccurately alleges "[n]othing in the Agreement allowed

Verizon to submit claims for additional fees or surcharges," but fails to identify the basis for this

assertion. Am. Compl. ¶¶ 57-60. The publicly available statewide contract with Verizon

incorporates terms contemplating regulatory surcharges and fees, specifically including the

FUSF.[8] Specifically, the Verizon Wireless Pricing Sheet for States including Oklahoma, provides:

> Wireless carriers are assessed by the federal government to fund the
> delivery of universally-affordable telecommunications and
> information services under the Federal Universal Service Fund []
> program. The Federal Universal Service Charge [] is a percentage
> of the customer's applicable monthly wireless service charges based
> upon an assessment rate that changes quarterly … The quarterly
> percentage rate described above for the FUSC is applied in our
> billing system. Verizon Wireless also imposes state universal
> service charges. These charges vary by jurisdiction and are subject
> to change depending on changes in the state universal service
> impositions on Verizon Wireless.

*See* Ex. E.[9] The Court may take judicial notice of information posted on official government

websites without converting a motion to dismiss to one for summary judgment. *See Aslam v. U.S.*

*Dept. of State*, No. 2:22-CV-00701, 2023 WL 6163969, at *9 (D. Utah Sept. 21, 2023) (citing

*Hodgson v. Farmington City*, 675 F. App'x 838, 840–41 (10th Cir. 2017) (unpublished)); *see also*

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009)

(concluding information on government website was subject to judicial notice). Oklahoma Office

---

[8]    Oklahoma    Statewide    Contract    No.    SW1012V    (available    at:
https://www.ok.gov/dcs/solicit/app/solicitationDetail.php?solID=3954  (last visited October 10,
2023); *incorporating by reference* Verizon Wireless Pricing Sheet Western States Contracting
Alliance Contract for Services #1907 For States Including Arizona, California, Colorado, Idaho,
Nebraska,    Oklahoma,    Oregon,    Utah    &    Washington    (available    at:
https://www.phoenix.gov/policesite/Documents/104782.pdf (last visited October 10, 2023)
[9] *Id*.

Management & Enterprise Services makes statewide contracts available on its website for the apparent purpose of facilitating agency use of those contracts.[10]

Finally, Relator cannot allege factual falsity because he does not allege that Verizon billed for services it did not render. *See, e.g.*, *U.S. ex rel. Westrick v. Second Chance Body Armor*, 128 F. Supp. 3d 1, 10 (D.D.C. 2015) (rejecting government's argument that FCA claim premised on "sale of defective bullet proof vests" could be argued under theory of factual falsity, where "the government's claim here is not that it did not receive bullet proof vests, but that the bullet proof vests in this case did not comply with express and implied agreements."). As such, the Court should dismiss Relator's claim to the extent it is premised on a theory of factual falsity, because Verizon did in fact deliver to the State through its school districts the Devices the OKSDOE purchased.

## 2.     Relator Does Not Plead Facts to Support a Legal Falsity Theory

If Relator is propounding a theory of legal falsity—and the coherency of the Amended Complaint makes it difficult to discern—then, it too must fail. Although legal falsity may take two forms, both require a false certification. *See Polukoff*, 895 F.3d at 741. "An express false certification theory applies when a government payee falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Id.* For implied false certification, two conditions must be satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs. Inc. v. U.S. ex rel. Escobar*, 579 U.S. at 176, 190 (2016). Neither are met here.

---

[10]  *See*  https://oklahoma.gov/omes/divisions/central-purchasing/agencies/statewide-contract.html (directing Oklahoma agencies to the statewide contract search to facilitate contract use).

Most importantly, conduct which complies with clear contractual specifications cannot, by definition, amount to a false representation. *See, e.g., U.S. ex rel. Grupp v. DHL Worldwide Exp., Inc.*, 604 Fed. App'x 40 (2d Cir. 2015). Additionally, even if Relator did point to a specific contractual provision that he believes was violated, he cannot use a simple breach of contract allegation to assert an FCA violation. *See U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370. 373 (4th Cir. 2008) ("If every dispute involving contractual performance were to be transformed into a *qui tam* FCA suit, the prospect of litigation in government contracting would literally have no end.").

Relator's vague allegation in the Amended Complaint to the FCC's requirements related to FUSF charges fall far short of a legal falsity theory. Am. Compl. ¶¶ 63-67. First, Relator has not alleged that Verizon made an express certification with a particular statute, regulation, or contractual term. Any explanation of surcharges is not a prerequisite to Verizon receiving payment. Am. Compl. ¶ 64. Second, an implied theory also fails. General boilerplate language, which may or may not be applicable, does not constitute specific representations about the goods or services provided. Third, even if it is true that Verizon included FUSF on the District's bill, there is nothing illegal about that. Relator misstates the controlling law, failing to understand the distinction between telecommunication services and non-telecommunications revenues. The Telecommunications Act of 1996 ("the Telecom Act") requires that the FCC establish a mechanism to fund the universal service fund ("USF"). 47 U.S.C. § 254(c). To accomplish this directive, the FCC requires telecommunications carriers and certain other providers of telecommunications to report each year on the Telecommunications Reporting Worksheet ("FCC Form 499") the revenues they receive from service offerings that fit within the scope of the revenues subject to assessment. Section 254(d) applies not only to "every telecommunications

13

carrier that provides interstate telecommunications services" but also to certain "other provider[s] of interstate telecommunications." 47 U.S.C. § 254(d).

The FCC assesses USF on local private line and business data services. There is an exception to the contribution obligation for "other revenues" that includes a specific exemption for non-telecommunications revenue, including information services. FCC Form 499, Line 418. Information services, unlike telecommunications services, allow for storage and manipulation of the information as opposed to pure transmission, which is core to the definition of telecommunications. *See* 47 U.S.C. § 153(54) (defining telecommunications). As such, the FCC's USF contribution obligations generally apply to all connectivity services.

Here, Verizon offers services over a private line or private network that does not traverse the public internet, but rather isolates customer data and routes it to a specific private network gateway. Specifically, contractually OKSDOE required Verizon to route all internet traffic through the Oklahoma OneNet virtual private network. *See* Ex. A. The FCC assesses USF on local private line and business data services. Thus, Relator's allegations that Verizon charged improper surcharges (Am. Compl. ¶¶ 57-67) must fail because the FCC requires payment of FUSF charges for the services provided to the school district.

Finally, Verizon did not charge Relator's District any taxes. For this reason, Relator's indirect allegation that it would be improper for Verizon to charge schools any form of a tax fails. Am. Compl. ¶ 66. Moreover, Relator did not allege with sufficient specificity which taxes might be at issue to provide Verizon and the Court any notice of Relator's allegations. This allegation implies that Verizon taxed the District—which it plainly did not. Relator seems to refer to the "Explanation of Surcharges" section from each monthly bill Verizon submitted. Am. Compl. ¶ 64. Relator omits, however, the final two sentences of that section, which state as follows: **"Please**

note that these are *Verizon Wireless charges, not taxes*. These charges, and what's included, are subject to change from time to time." *See* Ex. D (emphasis added).

### B.    The Amended Complaint Lacks Sufficient Allegations of Scienter

Because Relator fails to allege that Verizon submitted a false claim; it is nearly impossible to discern any colorable allegations of Verizon's knowledge regarding the same. FCA liability applies only when a defendant "knowingly" violates the law, *see* 31 U.S.C. § 3729(a)(1), which means that the defendant "has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard for the truth or falsity of the information.'" *Escobar*, 579 U.S. at 182 (quoting 31 U.S.C. § 3729(b)(1)(A)). "[T]he scienter and falsity elements of an FCA claim are two sides of the same coin[,]" and a Relator cannot demonstrate scienter without first alleging falsity. *U.S. ex rel. Steuert v. L3 Harris Techs.,* 2022 WL 970187, at *5 (D.N.J. Mar. 31, 2022), *appeal dismissed sub nom. Steuert v. L-3 Commc'ns Corp.*, 2023 WL 421006 (3d Cir. Jan. 26, 2023). Because Relator has failed to allege that Verizon engaged in a false or fraudulent course of conduct, the Court need not take the extra step in determining whether Verizon "knowingly" did so.

But even if Relator had alleged that Verizon made a false claim or engaged in a fraudulent course of conduct, the Amended Complaint lacks any allegations from which the Court could infer that Verizon knowingly and intentionally made any false representations or behaved fraudulently. As with materiality, the FCA's scienter element is "rigorous." *Escobar*, 579 U.S. at 192. Negligence is not enough, nor will conclusory allegations of intentional or reckless misconduct suffice. *See U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 949 (10th Cir. 2008).

Relator's purported factual allegations to support scienter mostly consist of conclusory statements that Verizon knew or should have known about "defective" Devices. *See* Am. Compl. ¶ 30 (alleging that "[t]he specific devices provided by Verizon were defective and known by

[Verizon] to be defective (or should have been known by [Verizon] to be defective) as there were reports of multiple failures dating back to at least 2018[.]"); Am. Compl. ¶ 14 (stating "Verizon knew or should have known the devices they were providing through the Program were defective[.]"); Am. Compl. ¶ 76 (alleging generally that Verizon "knew or should have known" the Devices "were defective prior to [Verizon] providing the defective devices…"). These allegations are 'poster child' examples of conclusory allegations of scienter that fall well short of the rigorous requirement for a *qui tam* claim.

All of Relator's allegations that Verizon "should have known" of defects are plainly insufficient to establish the requisite scienter, because "[u]nder Tenth Circuit authority, simple negligence does not violate the False Claims Act." *U.S. ex rel. Boggs v. Bright Smile Family Dentistry, P.L.C.,* 2013 WL 1688898 at *3 (W.D. Okla. 2013) (citation omitted). Additionally, Relator's allegations that Verizon actually "knew" of the defects are also insufficient, because they are conclusory and thus fail to provide the "factual basis that gives rise to a strong inference of fraudulent intent." *U.S. ex rel. Simpson v. Leprino Foods Dairy Prods. Co.*, 2018 WL 1375792, at *2 (D. Colo. Mar. 19, 2018). Relator's generalized allegations that Verizon "knew" the devices were defective fail to meet this exacting standard. Courts have squarely rejected FCA claims premised on conclusory allegations that a defendant "knew" of its allegedly wrongful activities without specific allegations of actual knowledge or at least enough facts establishing a supportable inference of such knowledge. *See, e.g., U.S. ex rel. Complin v. N. Carolina Baptist Hosp.*, 818 F. App'x 179, 183 (4th Cir. 2020) (rejecting "a general and conclusory allegation that the Hospitals 'knowingly' submitted false claims" and explaining than an FCA plaintiff must do more, set[ting] forth specific facts that support an inference of scienter.") (internal citation and quotation omitted); *U.S. ex rel. Ambrosecchia v. Paddock Labs., LLC,* 855 F.3d 949, 955 (8th Cir. 2017).

Even accepting that Relator's conclusory allegations are sufficient to plead that Verizon did know that certain of the Devices could be defective or that Verizon knew that certain surcharges might not be reimbursable, it would still be insufficient because "the False Claims Act is not a strict liability offense." *U.S. ex rel. Dunn v. Procarent, Inc.*, 615 F. Supp. 3d 593, 617 (W.D. Ky. 2022). Relator alleges nothing to suggest that Verizon provided the Devices with an unlawful intent. Relator's personal opinions do not plausibly plead that *Verizon* knew that the Devices it provided to the District were anything other than industry-standard Devices, or that it sought reimbursement for surcharges to which it was entitled under federal law. Relator's understanding of a false claim "would transform every inaccurate claim into a false claim and consequently replace the Act's knowledge requirement with a strict liability standard." *U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 743 (7th Cir. 2007). For all of these reasons, Relator fails to plead that Verizon acted with "actual knowledge," "deliberate ignorance," or "reckless disregard" for the fact that the Devices it provided might lead to the submission of a false claim.[11]

C.     **The Amended Complaint Fails to Plead Materiality**

The Amended Complaint also fails to allege that any false statements made by Verizon were material to reimbursement. Materiality is a "rigorous" and "demanding" element of a claim under the False Claims Act. *Escobar*, 579 U.S. at 192, 194. As the Supreme Court has explained, any analysis of the False Claims Act's materiality element must "look[] to the effect of the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002. That the government may have "designate[d] compliance with a particular statutory, regulatory or

---

[11] To the extent that Relator relies on the CPSC recall of the Devices, which occurred after the relevant claims in this case were submitted, as a basis for scienter as to Verizon, the Court must squarely reject such a proposition because what matters for the scienter inquiry is "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it." *Schutte.*, 598 U.S. at 752 (emphasis in original).

contractual requirement as a condition of payment" is not enough to make a misrepresentation about compliance material, "[n]or is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* Instead, "the sine qua non of materiality is some quotient of potential influence on the decision maker." *Janssen*, 949 F.3d at 540. Thus, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.

Here, Relator offers no details at all concerning the alleged claims Verizon submitted, and nothing about the amount of money paid by the State to Verizon for the 50,000 Devices, stating only in conclusory fashion that "Defendant billed the District at the rate of $10.00 per month, plus FCC/USAC fees, for each of the 500 devices purchased by the District[.]" Am. Compl. ¶ 55. But, because Relator has not identified the applicable provisions of the contract between Verizon and the District, this allegation reveals virtually nothing other than establishing Relator's failure to meet the pleading standards for an FCA case. Furthermore, no facts presented anywhere in the Amended Complaint suggest that the alleged "defects," as Relator generally describes, were material to the government's payment of claims for services Verizon rendered to the District.. Even if Relator had made that allegation *explicitly*—and, to be clear, he did not—it would still be insufficient to show materiality, because "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Escobar*, 579 U.S. at 194. Absent any allegation of non-compliance with any statutes or regulations, there is nothing to infer from the Amended Complaint that Verizon made any misrepresentation at all, much less a material one.

Similarly, Relator offers no details to support the claim that the contract did not permit Verizon to seek reimbursement for surcharges and fees. Here, even if Relator's claims relating to the contractual requirements were accurate, they would not give rise to materiality. *See United States ex rel. Hubert v. Bd. of Educ. of City of Chicago*, No. 16 C 4336, 2018 WL 6248827, at *8–9 (N.D. Ill. Nov. 29, 2018). Relator acknowledges that each monthly bill submitted to Relator's District by Verizon included an explanation of surcharges. Am. Compl. ¶ 64. With the benefit of this explanation, the District still paid the monthly bills. Having made the payments, despite a clear and obvious explanation of the fee provides some indication that the District would have made payment even if the contract disallowed such fees. *See Escobar,* 136 S. Ct. at 2004 n.6. ("Not every breach of contract or regulation is material, and `minor or insubstantial' noncompliance never is."). Yet, the contract allowed these fees, and so Relator's claim must fail.

Tellingly, it also cannot be ignored that the federal government has not sought to recoup payment from Verizon, despite being on notice of the original Complaint since at least April 2021, which is more than two years ago.  Additionally, the State having been aware, as the contracting entity, of the details of the arrangement for purchase of the Devices has also not pursued any repayment. As Relator argues, "defects" in these products were purportedly generally known dating as far back as 2018. Presumably these "reports" were also available to the federal government and the State—or at least the Amended Complaint does not indicate otherwise. The lack of any government effort, either federal or State, to address the purported fraud that Relator alleges affected "millions of hotspot recipients" actually disproves the point. *See, e.g.*, *Janssen*, 949 F.3d at 542 (stating that the government's "inaction in the face of detailed allegations" of fraud "suggest[ed] immateriality"); *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) ("The fact that CMS has not denied reimbursement ... in the wake of [FCA] allegations casts serious doubt on the

materiality of the fraudulent representations."). In sum, Relator has not come close to offering well-pleaded factual allegations that would satisfy the FCA's "rigorous" and "demanding" materiality element, and his FCA claim should be dismissed on that basis. *See Escobar*, 579 U.S. at 195 n.6 ("We reject [the] assertion that materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss ....").

> **D.    The Amended Complaint Fails to Plead Fraud With Particularity**

Even if Relator had pleaded a plausible violation of the False Claims Act, the Amended Complaint would still fail because it lacks the particularity demanded by Rule 9(b). An FCA relator must plead "the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *U.S. ex rel. Lemmon v. Envirocare of Utah*, 614 F.3d 1163, 1172 (10th Cir. 2010). *See also* Fed. R. Civ. P. 9(b).

Courts within this Circuit have recognized that "the allegations of the actual submission of a specific request for payment to the government is necessary in most FCA cases[.]" *U.S. ex rel. Wagner v. Care Plus Home Health Care, Inc.,* 2017 WL 6329850, at *4 (N.D. Okla. Dec. 11, 2017). To that end, courts have found a "fraudulent scheme" to be lacking when the relator's allegations fail to provide specific details concerning billing statements. *See, e.g., U.S. ex rel. Clark v. UnitedHealth Grp., Inc.,* 2016 WL 9777207, at *6 (D.N.M. Sept. 22, 2016) ("Without alleging any dates of specific false claims made by any Defendants, Relator fails to plead with particularity that Defendants submitted false claims with knowledge or reckless disregard for their falsity (or, in other words, that Defendants submitted claims after discovering fraud on the part of their subcontractors)."); *see also Colorado and U.S. ex. rel. Lovato v. Kindred Healthcare, Inc*., 2021 WL 1085423, at *10 (D. Colo. Mar. 22, 2021) (rejecting conclusory allegations of false claims submissions).

Here, the Amended Complaint's allegations concerning Verizon do not come close to complying with the exacting requirements of Rule 9(b). As to Verizon's actions in the District, the *only* allegations made by Relator *about Verizon* are that it provided the District with 500 Devices (Am. Compl. ¶¶ 54-55), that Verizon "knew all devices were not brought into use or were not able to accomplish connectivity and presented extreme hazard and safety concerns due to overheating" (Am. Compl. ¶ 56), that Verizon billed the District at $10 per month for each of the 500 devices plus FCC/USCA fees (Am. Compl. ¶ 55), and that federal funds from the CARES Act and other COVID-19-related emergency funding reimbursed Verizon for that billing (Am. Compl. ¶ 76).

Nowhere in these allegations, however, does Relator provide any details of the following: the number of Devices for which Verizon sought reimbursement, the number of those Devices that were allegedly "defective[,]", what Verizon represented to the District about the Devices,  when Verizon specifically learned of the defects, when Verizon learned that some of the Devices had not been distributed, and how many were not being used, or when Verizon learned that MDM was not accessible for some of the Devices, and whether any Devices were used for non-educational purposes.

Nor does Relator offer a specific *date* or *claim* submitted to the government or *what* Verizon stated (or omitted) in those claims. Under the most generous reading of the Amended Complaint, Relator has alleged that Verizon provided the District with some Devices that could have been defective, sought reimbursement for certain surcharges, and was reimbursed for some portion of those expenses through federal funding. But, there are almost no particularized allegations as to Verizon.  Relator almost exclusively only points to events elsewhere, not involving Verizon or located in Oklahoma, as somehow indicating what Verizon *knew* with respect to activities in Oklahoma. This is nonsensical. Although the Amended Complaint generally

references a monthly billing arrangement, the Amended Complaint fails to refer to any particular claim number, the specific date on which any claim was actually submitted, or any identifiable person responsible for submitting any claim. *See, e.g.*, *U.S. ex rel. Ernst v. HCA Healthcare, Inc.*, 2020 WL 6868775, at *4 (D. Kan. Nov. 23, 2020) (unpublished) (allegations were insufficient under Rule 9(b) where, as in this case, the relator "ha[d] not alleged the dates of submission of claims to the government, the claim numbers, the amounts of claims, or the identify of any person involved in the submission of the claims").

Additionally, Relator is not permitted to rely on general allegations lodged against Verizon as a single entity to plead viable FCA claims that naturally would have involved individual actors. Rule 9(b) requires a relator to plead with particularity, among other elements, "the *who*" of the alleged fraudulent scheme. *See Sikkenga*, 472 F.3d at 727. Consequently, the Amended Complaint's failure to link particular false claims to particular Verizon employees, or other individual actors, dooms Relator's claims against Verizon. *See Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("Rule 9(b) requires that a complaint set forth the identity of the party making the false statements, that is, which statements were allegedly made by whom."). Particularly, when a defendant entity is "made up of hundreds, if not thousands of employees," Rule 9(b) "[a]t a minimum ... demands that [a relator] identify the employee or employees responsible for the alleged false claims under the FCA." *U.S. ex rel. Barrick v. Parker-Migliorini Int'l, Inc.*, 2015 WL 9412537, at *4 (D. Utah Dec. 22, 2015); *see also U.S. ex rel. Brooks v. Stevens-Henager Coll.*, 305 F. Supp. 3d 1279, 1292 (D. Utah 2018) ("It is particularly important ... that the complaint make clear exactly *who* is alleged to have done *what* to *whom*") (internal quotation marks omitted).

22

## II.   RELATOR IS NOT AN ORIGINAL SOURCE

Even if Relator had sufficiently pleaded a violation of the False Claims Act, the Court must still dismiss the Amended Complaint because Relator is not an original source of the information alleged in the Amended Complaint. The public disclosure bar "compels courts to dismiss *qui tam* claims 'if substantially the same allegations ... as alleged in the action or claim were publicly disclosed,' unless the relator 'is an original source of the information.'" *U.S. ex rel. Reed v. Keypoint Government Solutions*, 923 F.3d 729, 737 (10th Cir. 2019) (quoting 31 U.S.C. § 3730(e)(4)(A)). "The Tenth Circuit has employed a four-step analysis in applying the public disclosure bar, by which the court addresses the following questions: (1) whether the public disclosure contains allegations from one of the listed sources; (2) whether the disclosure has been made public; (3) whether substantially the same allegations from the public disclosures are made in the relator's complaint; and (4) whether the relator qualifies as an 'original source.'" *In re: Syngenta AG Mir 162 Corn Litig*., 2016 WL 5851795, at *2 (D. Kan. Oct. 6, 2016) (citing *U.S. ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1048 (10th Cir. 2004))

To qualify as an original source, Relator: (1) must have voluntarily disclosed to the government the information on which the allegations are based "prior to [the] public disclosure[;]" or (2) must "ha[ve] knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and "has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B). Dismissal is appropriate when "the complaint itself admits all the elements of the [public disclosure bar] by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018). Therefore, "[s]ince the FCA *requires* a court to dismiss a claim based on public disclosure, a court necessarily considers the alleged public documents in its dismissal." *U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1083 (8th Cir. 2014).

Here, the Amended Complaint, along with publicly available material, establishes the public-disclosure bar's applicability to Relator's claims. Relator attempts to allege that Verizon knew that the Devices were defective in paragraph 30 of the Amended Complaint. There, Relator states that "[t]he specific devices provided by Verizon were defective and known by Defendant to be defective (or should have been known by Defendant to be defective) as there were reports of multiple failures dating back to at least 2018 and which were eventually ordered to be recalled in the entirety by the U.S. Consumer Product Safety Commission." This allegation says nothing of the source of this information. It hides the source behind the passive voice, declaring unrevealingly that "there were reports of multiple failures dating back to 2018." This foggy assertion gives no reason to suppose that Relator was the original source of this information.

Additionally, a search of the CPSC's website regarding the Ellipsis Jetpack reveals at least one incident report from 2018, where a customer complained about a Verizon device overheating, much in the same way that Relator alleges in the Amended Complaint.[12] The customer report, dated May 10, 2018, states that the "Verizon modem Ellipsis Jetpack MHS 815 L swells to twice normal, too hot to touch, smells, shuts down. Battery is sealed inside unit. Verizon store unable to remove battery...." *See* Ex. B, available at https://www.saferproducts.gov/PublicSearch/Detail?ReportId=1766282. This customer report, dealing with a different model of the Jetpack, was revealed to the public *on a federal government* website more than two years before Verizon provided the Devices to the District. Relator's theory suggests no more than that he saw this report and then used it as a basis for this lawsuit. *See* Am. Compl. ¶ 40 ("On information and belief, the

---

[12] The Court may consider this report without converting this Motion to a motion for summary judgment. *See Aslam*, 2023 WL 6163969, at *9.

defect in the device was known to Verizon as early as 2018[.]"). Further, Verizon publicly announced the recall on April 8, 2021, the day before Relator filed his Complaint. *See* Ex. C.

Further undercutting Relator's suggestion that he is an original source is his use of allegations from a pending securities class action lawsuit against the manufacturer of the Devices. *See* Am. Compl. ¶¶ 44-46 (citing allegations from *Ali et al. v. Franklin Wireless Corp. et al*., Case No: 3:21-cv-00687 (S.D. Cal.)). In that case, a class of plaintiffs alleges that Franklin Wireless misled investors by failing to disclose that hotspot devices suffered from overheating issues. *Franklin Wireless*, ECF No. 1 at ¶ 9. Of course, this complaint, filed on April 16, 2021, alleges nothing about Verizon's activities in Oklahoma—rather Relator's allegations were already in the public domain. First, as in Relator's Amended Complaint, the plaintiffs in *Franklin Wireless* also refer to the April 8, 2021, recall. *Franklin Wireless*, ECF No. 26 at ¶ 6(b). But, the *Franklin Wireless* plaintiffs allege that even earlier *"[o]n April 1, 2021,* Franklin stated that it 'had been notified of reports of battery issues in some of its wireless hotspot devices'" *Franklin Wireless*, ECF No. 26 at ¶ 6(a) (emphasis added)[13] and that, subsequently, Franklin's "share price fell $0.35, or 1.65%, to close at $20.77 per share *on April 5, 2021*, the next trading session, on unusually heavy trading volume." *Franklin Wireless*, ECF No. 26 at ¶ 6(a).

Thus, Relator alleges Verizon "knew" the hotspot devices were defective by parroting what the government would have already known was in the public domain. In short, Relator fails to make any material contribution to publicly disclosed information, and his claims are thus barred.

## CONCLUSION

For the foregoing reasons, the Court must dismiss the Amended Complaint with prejudice.

---

[13] *See also* Franklin Wireless Investigating Battery Issues, April 1, 2021, available at https://www.globenewswire.com/en/news-release/2021/04/02/2203758/0/en/Franklin-Wireless-Investigating-Battery-Issues.html (last visited October 11, 2023).

DATED: October 23, 2023

Respectfully submitted,

_s/ John D. Russell_

John D. Russell, OBA No. 13343
GABLEGOTWALS
110 North Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120-1495
Telephone: (918) 595-4800
_jrussell@gablelaw.com_

-and-

Michael Francisco, _pro hac vice_
Charles Wm. McIntyre, _pro hac vice_
Edwin O. Childs, Jr., _pro hac vice_
Michael A. Brody, _pro hac vice_
MCGUIREWOODS, LLP
888 16th Street N.W., Suite 500
Washington, DC 20006
Telephone: (202) 857-1700
_mfrancisco@mcguirewoods.com_
_cmcintyre@mcguirewoods.com_
_echilds@mcguirewoods.com_
_mbrody@mcguirewoods.com_

COUNSEL FOR DEFENDANT
VERIZON COMMUNICATIONS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2023, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

_s/John D. Russell_

John D. Russell

26