# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| UNITED STATED OF AMERICA, *ex rel.* SCOTT FOSTER, <br><br> Plaintiff, <br><br> v. <br><br> CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, <br><br> Defendant. | Case No. 21-CV-00166-SEH-MTS |

## <u>OPINION AND ORDER</u>

Relator Scott Foster ("Foster") seeks to recover damages and civil penalties on behalf of the United States under the False Claims Act ("FCA"). [ECF No. 40]. He alleges that during the COVID-19 pandemic Defendant Cellco Partnership d/b/a Verizon Wireless's ("Verizon") accepted federal funds and promised to provide "school districts and low-income households with mobile hotspot devices for broadband connectivity," but then fraudulently unloaded defective hotspots on unsuspecting schoolchildren and others in Ardmore, throughout Oklahoma, and across the Nation. [ECF No. 40 at 19]. Verizon moves to dismiss his claim, arguing that Foster has failed to state a claim upon which relief can be granted. [ECF No. 48]. For the reasons set out below, Verizon's motion to dismiss is granted.

## I. Procedural History

Foster first asserted a single FCA claim against Verizon in April 2021. [ECF No. 2]. The Complaint remained under seal until the government declined to intervene. [ECF No. 14]. After Verizon moved to dismiss the Complaint in June 2023 [ECF No. 36], Foster amended his Complaint [ECF No. 40]. Verizon now moves to dismiss Foster's Amended Complaint. [ECF No. 48].

Verizon argues that the Amended Complaint fails to plead a violation of the FCA and does not show that Foster is an original source of the information alleged. [ECF No. 48 at 13–30].

## II. Factual Allegations in the Amended Complaint

Foster is an employee of Ardmore City Schools ("Ardmore Schools"). [ECF No. 40 at 3, ¶ 11]. He became aware of "the false and fraudulent claims" he alleges "through his extensive work as the Technology Director for Ardmore City Schools, [which] include[ed] reviewing invoices and/or billing statements for services rendered for broadband service and devices purchased for such purpose." [*Id*. at ¶ 12].

Oklahoma, through the Oklahoma State Department of Education ("OSDoE"), purchased 50,000 Verizon Ellipsis Jetpack 900L devices using federal funding the State received via the CARES Act. [ECF No. 40 at 6, ¶ 27]. Ardmore Schools received 500 of the 50,000 hotspot devices purchased

2

and distributed 360. [*Id.* at 8, ¶ 33]. Some unspecified number of these devices were "defective," while 50–70 of the hotspots were allegedly unusable because the devices could not become enrolled in Verizon's Mobile Device Management Suite ("MDM").[1] [*Id.*].

Devices like the ones purchased by OSDoE allegedly failed because the "lithium-ion batteries in the Jetpacks … were prone to overheat rapidly and without warning to the end-user." [ECF No. 40 at 10, ¶ 43]. Franklin Wireless Corporation ("Franklin"), the importer of the hotspot devices, is facing a securities class action suit in a federal district court in California that is related to such failures in these types of devices. [*Id.* at ¶ 44].

On April 8, 2021, the U.S. Consumer Product Safety Commission ordered Verizon to recall and replace more than 2.5 million of the Franklin Ellipsis Jetpack devices.[2] [*Id.* at 9, ¶ 40]. According to Foster, the alleged hazard these devices represented reached not just Ardmore Schools but impacted "millions of hotspot recipients" who received the devices through the federally funded CARES Hotspot Grant. [*Id.* at 13, ¶ 55].

The Amended Complaint does not directly allege that any of the 50,000 devices OSDoE obtained overheated or suffered heat-related damage. Rather,

---

[1] The Amended Complaint does not allege a reason for the reported MDM failure.
[2] Although the Amended Complaint only alleges that the devices were "ordered to be recalled," the recall notice referenced and linked in footnote 3 of the Amended Complaint states that the "remedy" under the recall is "replacement."

it alleges that Verizon was aware that devices like the ones sold to OSDoE "had significant overheating issues causing heat-related damage." [*See* ECF No. 40 at 9, ¶ 40]. Therefore, Foster alleges, the hotspot devices sold by Verizon under its contract with OSDoE presented an "extreme hazard and safety concern[] due to overheating." [*Id.* at 13, ¶ 55].

Some devices obtained by Ardmore Schools were simply never taken out of their boxes. [ECF No. 40 at 12, ¶ 54]. The contract between OSDoE and Verizon required OSDoE to "maintain at least 50,000 unit activations at all times" and required Verizon to "provide unlimited data per device." [*Id.* at 13, ¶ 57]. A practical consequence of this requirement was that, even if Oklahoma schools weren't using all 50,000 devices, Verizon still billed for service to all 50,000 devices. [*Id.* at 12, ¶ 55]. So, regardless of the operability or functionality of the hotspot devices, Ardmore Schools was responsible for the $10 per month, per device, service fee for all 500 devices it received. [*Id.* at 13, ¶ 57].

Foster also maintains that Verizon added improper surcharges and taxes assessed that impacted "school districts and low-income families across the State of Oklahoma and the Nation." [ECF No. 40 at 13–14, ¶ 56, ¶ 64]. He alleges that Verizon could not charge the schools a surcharge because the agreement did not allow it and because state law prohibited taxing the schools. [*Id.* at 14, ¶¶ 66–67].

4

### III. Standard

When considering a motion to dismiss, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697, 700 (10th Cir. 2014) (quotation omitted). To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Federal Rules of Civil Procedure 8(a) and 9(b) together form the pleading requirements for an FCA claim. First, a complaint "must contain ... a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The purpose of Rule 9(b) is "to afford defendant[s] fair notice of plaintiff's claims and the factual ground upon

which [they] are based." *Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) (quotation omitted). Well-pleaded facts under the FCA must include "the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.* (citations omitted).

"[U]nless there is an applicable statute or rule expressly or by fair implication providing otherwise, the use of [the] word [fraud or fraudulent] is not indispensably necessary to the pleading of a cause of action … upon the ground of fraud." *Nolan Bros. v. United States for Use of Fox Bros. Const. Co.*, 266 F.2d 143, 145 (10th Cir. 1959). But Rule 9(b) does require the relator to "set forth the who, what, when, where and how of the alleged fraud." *United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*, 232 F.3d 902 (Table), 2000 WL 1595976, at *3 (10th Cir. 2000) (citations and internal quotation marks omitted).

## IV. Discussion

The False Claims Act, 31 U.S.C. §§ 3729–33, permits a *qui tam* action against those who defraud the government through submission of fraudulent claims for payment. *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 736 (10th Cir. 2019); 31 U.S.C. § 3730(b) & (c). Individuals who bring these private suits on behalf of the United States are known as "relators." *Id.* Relators are permitted to recover civil penalties and treble

6

damages from anyone who "knowingly presents … a false or fraudulent claim for payment or approval." 31 U.S.C. §§ 3729(a)(1)(A), 3730(d). Liability can also attach to anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. at § 3729(a)(1)(B).

Here, much of the Amended Complaint focuses on the defects of the Jetpack hotspot devices provided to OSDoE and Ardmore Schools under Oklahoma's contract with Verizon. Foster alleges that the hotspot devices were "utterly defective," and that Verizon sold the devices to OSDoE knowing they were defective. [ECF No. 40 at 2, 7 ¶¶ 4, 30].

Foster alleges three main defects. First, he alleges that the hotspot devices were not suited to fulfill the purpose the government needed them serve.[3] [ECF No. 40 at 10, ¶ 46]. Next, he alleges that Verizon knew, since at least 2018, that some percentage of its Franklin hotspot devices would be defective due to overheating batteries. [*Id*. at 7, ¶ 30]. Finally, Foster claims that the MDM device management program that schools relied on to safely and legally connect children to the internet failed at nearly 20% rates, at least at Ardmore Schools.[4] [*Id*. at 12, ¶ 54].

---

[3] Foster alleges that the hotspot devices were designed to be used "for only a couple of hours per day" and not for continuous use by students. [ECF No. 40 at 10, ¶ 46]
[4] Although the hotspot devices could connect to the internet without the benefit of the MDM, the Amended Complaint alleges that schools could not distribute the

Beyond allegations that the devices were defective, Foster alleges that Verizon improperly collected fees and surcharges. He argues that the billed surcharges were not authorized by Verizon's contract with OSDoE, and that even if the contract had authorized the surcharges, they were still impermissible because hotspot devices are exempt from surcharges and Oklahoma schools are exempt from taxes. [ECF No. 40 at 13–14, ¶ 58, 63, 65–66].

Verizon argues that the Amended Complaint fails to identify any material misrepresentations, even if Foster's allegations are taken as true. [ECF No. 48 at 7].

The Tenth Circuit distinguishes between "factually false" claims and "legally false" claims under the FCA. *United States ex rel. New Mexico v. Deming Hosp. Corp.*, 992 F. Supp. 2d 1137, 1154 (D.N.M. 2013), abrogated in part on other grounds by *Universal Heath Servs., Inc. v. United States*, 579 U.S. 176 (2016) (citation omitted). A factually false claim may involve deceptive descriptions of goods or services provided or may falsely identify that goods and services were delivered when they were not. *Id*. Legally false claims "generally require knowingly false certification of compliance with a regulation or contractual provision as a condition of payment." *Lemmon*, 614

---

devices to children unless the MDM was active, to comply with federal law. [ECF No. 40 at 11–12, ¶¶ 49–52].

F.3d at 1168 (10th Cir. 2010). The misrepresentation of the defendant must be material to the government's decision to pay the claim, and not every violation will trigger liability under the FCA. *Universal Health Servs.*, 579 U.S. at 190-91 ("[N]ot every undisclosed violation of an express condition of payment automatically triggers liability. Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry.").

To determine whether an alleged misrepresentation was material, courts must look to "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs.,* 579 U.S. at 193. "The materiality standard is demanding." *Id*. at 194. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id*. And materiality cannot be found when "the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial." *Id*.

Here, the Amended Complaint fails to identify with specificity a material misrepresentation by Verizon. It is replete with allegations about Verizon's knowledge, e.g.,  Verizon knew "full well [that the devices] were … not fit for the purposes they were to be used, of all-day remote learning"; Verizon

9

"knew" "that the devices had "significant overheating issues""; Verizon "knew" the devices "were not brought into use or were not able to accomplish connectivity"; Verizon "knew" it was "improper for Verizon to charge schools any form of tax." [ECF No. 40 at 9–12, 14, ¶¶ 47, 40, 55, 67]. But the Amended Complaint contains no allegations that Verizon withheld or hid any of this alleged knowledge from the decisionmakers at OSDoE.

OSDoE and Verizon agreed upon a hotspot device model: the Ellipsis Jetpack 900L. [ECF No. 40 at 2, ¶ 3]. Foster makes no allegation of a "bait and switch" by Verizon. Oklahoma ordered what it wanted and got what it ordered. The Amended Complaint contains no allegation that any devices in Oklahoma fell victim to the overheating defect. Nor does it allege that the failure rate of any of the Oklahoma devices was higher than that of other similar devices. [5]

Of course, it is reasonable for any purchaser to expect that items purchased will work. If the military orders weapons from a contractor and none of them will fire, it would be eminently reasonable to open a fraud investigation to see why what was promised was not delivered. But if the

---

[5] Verizon accuses Foster of attempting to transform a products liability case into a false claims act case. [ECF No. 55 at 1]. Though I do not agree with this characterization, I do agree that Foster's Amended Complaint must sufficiently allege that the line between ordinary device failure (or even prolific device failure) and fraudulent scheme has been crossed.

military orders a new type of weapon that is expected to misfire 10% of the time, there would be no calls for such an investigation if those weapons misfired 10% of the time. Verizon's knowledge is relevant, but its knowledge alone does not plead a case under the FCA when the Amended Complaint fails to factually connect that knowledge to any material misrepresentation to OSDoE.

In addition to alleging that any misrepresentation was material, the Amended Complaint must also allege that Verizon acted knowingly. The FCA defines the "knowingly" scienter to mean a person who "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Thus, knowledge "require[s] no proof of specific intent to defraud." *Id*. at § 3729(b)(1)(B).

The scienter requirement is designed to prevent the FCA from being used to punish individuals or entities that merely perform poorly or make innocent mistakes. *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 949 (10th Cir. 2008) (citing *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir. 1992)). Relators are required to show more than the existence of a falsehood; they must show that the defendant knowingly presented a false claim for payment. *United States v. The Boeing Co.*, 825 F.3d 1138, 1149 (10th Cir. 2016). And if the government authorizes a claim

11

with knowledge of the facts underlying it, an inference arises that the defendant has not knowingly presented a false claim. *See Burlbaw*, 548 F.3d at 952–53.

Here, Foster alleges Verizon's knowledge of the overheating defect in the Amended Complaint. According to Foster, Verizon was interacting with Franklin by raising concerns about the overheating issues and returning faulty devices as early as 2018. [ECF No. 40 at 10, ¶ 44]. In addition, Foster alleges that Verizon was returning devices to Franklin, at rates "double the industry standard." [6] [*Id*. at 10, ¶ 45]. Based upon these allegations, Foster concludes that Verizon "deliberately ignored" or "recklessly disregarded" information about the overheating defect. [ECF No. 40 at 9, ¶ 40.]

However, Foster claims no personal knowledge of the alleged overheating defect. Any suggestion that devices purchased by Oklahoma may have fallen victim to the overheating defect are only alleged by analogy to facts from a separate lawsuit filed against Verizon's importer, Franklin Wireless. [ECF No. 40 at 10, ¶¶ 44–45]. Accepting information cross-alleged by Foster from the Franklin lawsuit as true, the fact that Verizon returned overheating

---

[6] The allegation in the Amended Complaint provides no context for the alleged "return rate of the devices" statistic. How did the Franklin devices compare to other devices produced at that time in construction and function? How does Verizon handle importer complaints and returns relative to how other companies handle returns? These are questions that the Amended Complaint does not answer; therefore, it limits my ability to draw inferences from the allegation.

12

devices to Franklin is not sufficient to allege that Verizon either deliberately ignored or recklessly disregarded information about the overheating defect. To the contrary, if Verizon were identifying and returning overheating devices in 2018, it would be reasonable to infer that it had implemented quality control measures to ensure devices subject to this defect were not sent to consumers.

Further accepting as true that Verizon, in its role as bulk distributor of Jetpack hotspot devices, returned the devices at a higher rate than usual to the importer, I find that nothing connects these returns with the Jetpacks delivered to the OSDoE. Inferences made from facts in the Amended Complaint must be reasonable. Without some additional context or a single factual allegation from Foster about heat-related device failures under the OSDoE contract—either at Ardmore Schools or elsewhere—it is not reasonable to infer that the hotspot devices failed at an unusually high rate at the consumer level in Oklahoma.

The allegations about the MDM failure are sparse in all respects. The Amended Complaint alleges, without explanation, that the MDM "routinely failed to function." [ECF No. 40 at 2, ¶ 4]. However, it does not allege that Verizon knew of the MDM failures at all. Foster alleges that "Defendant billed [Ardmore Schools] at the rate of $10.00 per month … for each of the 500 devices purchased," regardless of whether the devices were functional or

13

in use. [*Id.* at 12–13, ¶ 55]. This billing included devices allegedly rendered unusable to public schools due to failure of the MDM. [*Id.*].

Exhibit A to the Amended Complaint contains the terms of Verizon's offer to OSDoE through its Distance Learning Initiative. [ECF No. 40-1 at 2]. The offer required OSDoE to activate and maintain a minimum of 50,000 unit activations at all times on the "$10.00 Unlimited 4G LTE Data for Tablets and MiFi Jetpacks plan (or higher)." [*Id.*]. The offer also explicitly stated that "OSDoE will be charged a monthly access of $10.00 per device, per month, for [hotspot devices] that do[] not remain in service for a minimum for six (6) months after the activation of each device." [*Id.*].

Foster alleges that Ardmore Schools was awash in its share of those 50,000 hotspot devices, specifically claiming that 50 to 70 of its assigned devices could not be connected to the MDM system for whatever reason and another 80 to 100 of the devices were never removed from their shipping boxes. [ECF No. 40 at 8, ¶ 33]. Even assuming Verizon knew that it was charging Ardmore Schools for anywhere between 130 to 170 devices that were either not put in service or did not remain in service, those allegations are not sufficient to plead a claim that Verizon knowingly submitted a false bill to the government. Verizon's alleged billing practice was consistent with the OSDoE agreement, and Foster made no allegation that Verizon ever refused or failed to provide the services required under the agreement.

14

The surcharge allegation fares no better. The heart of the allegation is that Verizon improperly billed Oklahoma schools a surcharge through the Federal Universal Service Charge.[7] The Amended Complaint plainly alleges that the surcharge was assessed, and that Verizon requested payment. But, as discussed above, even if Verizon "knowingly charged schools surcharges and fees that were not authorized by the Agreement" that falls short of an allegation that Verizon knowingly presented *a false* surcharge for payment. [*See* ECF No. 40 at 14, ¶ 62].

Moreover, the existence of an "explanation of surcharges" in each monthly bill which explained that Verizon was invoicing the school for a Federal Universal Service Charge "to recover charges imposed … by the government to support universal service" does not support a theory that Verizon hid anything from the OSDoE. [ECF No. 40 at 14, ¶ 64]. Even if Verizon wrongly or improperly assessed the surcharge, that does not mean that it fraudulently did so absent any allegation that Verizon submitted the charge for payment with actual knowledge, deliberate ignorance, or reckless disregard that the claim was false.

---

[7] Although the Amended Complaint generally alleges that "Verizon knowingly charged schools surcharges and fees that were not authorized by the Agreement" the only specific allegation of an illegitimately assessed surcharge is the Federal Universal Service Charge. [ECF No. 40 at 14, ¶¶ 62, 65].

The circumstances here are like those in *Burlbaw*. In that case, several state university officials were accused of falsely certifying that their institution was a "minority institution" eligible for set-aside government contract grants from the Department of Defense. *Burlbaw*, 548 F.3d at 933. New Mexico State University was first listed as a minority institution in 1994 and continued to appear consistently as such, despite shifting criteria for inclusion. *Id*. at 936. In 2000, concerns were raised about the university's eligibility for inclusion because it was failing to track the necessary information about its Hispanic students. *Id*. at 937. An affidavit from a university leader indicated he believed that the university remained eligible so long as the Department of Education ("DoE") continued to keep the university on the list of approved minority institutions. *Id*. at 947.

In granting summary judgment to the defendants, the district court concluded that no reasonable jury could find, on these facts, that the university defendants acted with the scienter required under the FCA. *Burlbaw*, 548 F.3d at 948. The relators appealed, arguing that the defendants acted "with deliberate ignorance by relying blindly upon the DoE's lists" while ignoring and failing to verify independently whether the university could satisfy the statutory criteria. *Id*.

The Tenth Circuit found that the relators could not show the requisite scienter for an FCA claim, despite the university defendants' negligence.

16

*Burlbaw*, 548 F.3d at 949. The court was struck by what was not in the record. *Id*. The relators cited no evidence that the university defendants "intentionally ignored the statutory criteria; that they appreciated the significance of, yet disavowed, statistical data foreclosing [the university's] eligibility as a minority institution; or that they purposefully refused to verify the relevant demographics of [the university's] student body." *Id*. at 950.

Similarly, here, it is striking what is not alleged in the Amended Complaint. Although Foster concludes that "Verizon knew it was improper to surcharge schools for hotspots," he does not allege any facts that support this conclusion. [*See* ECF No. 40 at 14, ¶ 67]. Specifically, the Amended Complaint contains no factual allegation that Verizon intentionally ignored the law or purposefully refused to remove the surcharge once challenged on its applicability.

In his response to the motion to dismiss, Foster argues that Verizon takes a "self-servingly narrow view of permissible FCA theories" that the Amended Complaint supports. [ECF No. 52 at 6]. To avoid taking an impermissibly narrow view, I will consider Foster's claim by construing "false or fraudulent claim" broadly. "The principles embodied in this broad construction of a 'false or fraudulent claim' have given rise to two doctrines that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false: (1) false certification (either express or implied); and (2)

17

promissory fraud." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006) (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

### a. False Certification

False certification is a type of legally false claim that may be express or implied. *Lemmon*, 614 F.3d at 1168. Liability under the FCA under a false certification theory arises when a defendant falsely certifies that it has complied with requirements imposed by the law or the contract, *id.*, or makes a specific representation about the goods or services that it provides "but knowingly fails to disclose [its] noncompliance with a statutory, regulatory, or contractual requirement," *Universal Health Servs.*, 579 U.S. at 181. Express false certification can come in many forms, from a very formal false attestation of compliance to a much more informal false statement. *See Univ. of Phoenix*, 461 F.3d at 1172 ("So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach."). But to properly plead a false certification claim, Foster must identify with specificity Verizon's knowing and material false statement.

Foster has not plead either an express or implied false certification claim. As discussed above, he alleges that Verizon delivered some nonconforming goods and services, including hotspots that were defective and broadband

18

connectivity services that were "billed to the … school districts … even
though the devices failed." [ECF No. 40 at 7, ¶¶ 30–31]. He further alleges
that Verizon "knew or should have known" that some number of the hotspot
devices would fail, and I accept these allegations as true at this stage. But
the specific bases of Verizon's knowledge, as alleged in the Amended
Complaint, is not sufficient to raise a reasonable inference that Verizon
provided a materially false statement about the hotspot devices to the State
or to others. Nor does Foster point—either in the Amended Complaint or in
his response—to any false statement made by Verizon.[8] The Amended
Complaint contains no allegation that Verizon knowingly failed to disclose its
noncompliance with a statutory, regulatory, or contractual requirement.
Therefore, I find that Foster has failed to plead an FCA claim based on false
certification, either express or implied.

### b. Promissory Fraud

Promissory fraud (or, as it also known, promissory inducement) under the
False Claims Act is also a type of legally false claim. It permits liability to
attach to every "claim submitted to the government under a contract, when

---

[8] The Amended Complaint states that "[t]he United States, unaware of the false or
fraudulent records, statements, and claims made or caused to be made by
Defendant, paid and/or reimbursed and continues to pay and/or reimburse the
claims that would not be paid but for Defendant's false, fraudulent, and illegal
practices." [ECF No. 40 at 16, ¶ 75]. This statement is a legal conclusion, not a
factual allegation entitled to a presumption of truth.

the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct." *Univ. of Phoenix*, 461 F.3d at 1179. The Tenth Circuit has not addressed whether promissory fraud is a valid theory for recovery under the FCA. Regardless, any well-pleaded claim of promissory fraud would need to allege some factual allegation of inducement to contract through fraud. That is, to plead a claim under this theory, "the relator must demonstrate that a contractor, in seeking to obtain a contract … represented that it would do something that it planned not to do or that it otherwise engaged in fraud to secure the contract or benefit." *Deming*, 992 F. Supp. 2d at 1154. "[F]ailure to honor one's promise is just breach of contract, but making a promise that one *intends* not to keep is fraud." *Id*. (citing *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005)) (cleaned up).

Foster makes no such allegation in the Amended Complaint. Verizon's knowledge of a higher-than-normal return of these devices at the distributor level, even if exactly as alleged, is not sufficient to demonstrate that it used fraud to induce the OSDoE to contract.[9] Although the Amended Complaint

---

[9] Foster alleges in his response that the OSDoE would not have bought the hotspot devices if Verizon had disclosed information about the overheating defect. [ECF No. 52 at 22].This is not enough to compensate for the lack of specific factual allegations in the Amended Complaint.

alleges that Verizon was aware of the overheating defect, it does not allege that Oklahoma was unaware, or that Verizon withheld material information.

In support of his promissory fraud theory, Foster cites *Thor Guard*, a case decided in the Middle District of Florida. [ECF No. 52 at 15]. Thor Guard, Inc. was accused of selling faulty lightning predictor systems to the government. *United States ex rel. Gallo v. Thor Guard, Inc.*, No. 3:18-cv-811-J-32MCR, 2020 WL 1248975, at *1 (M.D. Fla. Mar. 16, 2020). The complaint alleged that after switching material that made its sensors, Thor Guard products did not accurately predict lightning. *Id.* at *2. Relators further alleged that Thor Guard was on notice that it had significant problems with its lightning prediction systems due to many client complaints, internal whistleblowers, and internal testing, but it fraudulently suppressed these issues when communicating with its clients, which included several U.S. government agencies. *Id.* at *1, 3. The district court found that the relators had "alleged with particularity that [the Thor Guard CEO] had knowledge the Products were inoperable and tried to cover it up … and that [the Thor Guard President] admitted to issues with the sensors saying … 'we will kill someone' if issues weren't resolved." *Id.* at *6.

On one hand, I find similarity between this case and *Thor Guard*: both cases contain allegations that a company contracted with the government to provide a service, and Foster alleges that Verizon—like Thor Guard—wholly

21

failed to deliver that service. But on the other hand, *Thor Guard* contained more: an allegation of a defect *combined with* the attending coverup and suppression of information. This combination created the FCA claim found in *Thor Guard*. *See Thor Guard, Inc.*, 2020 WL 1248975, at *3 ("Relators allege that since 2011, Thor Guard has covered up that its Products do not function as advertised and has suppressed complaints by sales representatives and customers. Thor Guard has not recalled its Products, which Relators allege would cost millions because all Products would need to be repaired or replaced."). Foster alleges that Verizon had been reporting failures and sent a "constant flow" of returns to Franklin in 2018 and 2019 before ultimately recalling all malfunctioning devices in April of 2021. [ECF No. 40 at 10, ¶ 44]. However, Foster fails to allege that Verizon covered up these problems or misled OSDoE or other purchasers. Therefore, I find that Foster has failed to plead a viable FCA claim based on promissory fraud.

## V. Conclusion

Verizon further argues that the court lacks jurisdiction because Foster is not an "original source" of the fraud in question. [ECF No. 48 at 28–30]. Having found no well-pleaded claim under the FCA, I find there is no reason to address these arguments. For the reasons set out above, the defendant's motion to dismiss Relator's Amended Complaint [ECF No. 48] is GRANTED

and Relator's Amended Complaint [ECF No. 40] is DISMISSED WITHOUT PREJUDICE.[10]

Verizon argues that Foster's requests for leave to amend in his response to the motion to dismiss are "improper." [ECF No. 55 at 8; ECF No. 52 at 15, 18]. The Court agrees. *See Johnson v. Spencer*, 950 F.3d 680, 721 (10th Cir. 2020). However, the Court also finds it feasible that Foster's allegations could be cured; thus, in accordance with Fed. R. Civ. P. 15(a)(2), if Foster wishes to amend, he must do so no later than 21 days after the date this order is entered. Failure to timely amend the Amended Complaint will result in dismissal of this action.

DATED this 8th day of May, 2025.

Sara E. Hill
UNITED STATES DISTRICT JUDGE

---

[10] As a result of this order, Defendant's motion to stay discovery [ECF No. 44] is denied as moot.